HERBERT HICKS *v*. STATE OF CONNECTICUT ET AL.
(SC 18050)
(SC 18056)

Rogers, C. J., and Katz, Palmer, Vertefeuille and Zarella, Js.

---

Argued March 20—officially released June 24, 2008

*Robert G. Clemente*, with whom was *Lorinda S. Coon*, for the appellants (defendants).

*Stephen M. Reck*, for the appellee (plaintiff).

*Opinion*

KATZ, J. The defendant state of Connecticut[1] appeals from the judgment of the trial court, rendered after a jury trial, in favor of the plaintiff, Herbert Hicks, for

---

[1] The plaintiff named both the state of Connecticut and the department of transportation as defendants in his complaint. For purposes of this opinion, where appropriate, we refer to both the state and the department of transportation collectively as the defendant.

damages pursuant to General Statutes § 52-556,[2] which provides a right of action against the state for persons whose injuries are sustained "through the negligence of a state . . . employee when operating a motor vehicle owned and insured by the state . . . ."[3] The defendant claims that the trial court improperly denied its motion to set aside the verdict after the plaintiff failed to produce evidence to prove that negligent operation of a state motor vehicle had caused his injuries. The defendant further claims that the trial court made numerous improper evidentiary rulings and that the jury improperly was permitted to award damages for lost wages for a period in which the plaintiff's absence from work was not causally related to the motor vehicle accident. We affirm the judgment.

The record reveals the following undisputed facts and procedural history. On November 29, 2001, the defendant department of transportation (department); see footnote 1 of this opinion; dispatched three of its workers to perform a mowing operation near the intersection of Route 94/Hebron Avenue and Foote Lane in Glastonbury. Richard Scheller operated an over-the-fence mower, which is a tractor with an implement on the side that extends over a guardrail or fence to cut the grass. Lionel Rodrigues drove to the site, with Jeremiah Haas as his passenger, in a large orange dump truck (department truck) carrying road signs and handheld

---

[2] General Statutes § 52-556 provides: "Any person injured in person or property through the negligence of any state official or employee when operating a motor vehicle owned and insured by the state against personal injuries or property damage shall have a right of action against the state to recover damages for such injury."

[3] The defendant appealed from the judgment of the trial court to the Appellate Court. Thereafter, the trial court reduced the plaintiff's damages to adjust for collateral sources. The defendant then filed a second appeal from the judgment after the adjustment to the Appellate Court. We then transferred both appeals to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. We note that, because the defendant filed its first appeal before the trial court had ruled on the defendant's motion for collateral source reduction, it would appear that, under *Smith* v. *Otis Eleva-*

sign paddles that were to be used to alert drivers to the operation. Rodrigues and Haas were assigned to be flagmen at the site, a function requiring them to direct approaching motor vehicles with handheld paddles marked on either side as "stop" or "slow." As the mowing operation was in progress, the plaintiff was driving westbound on Route 94 in a heavy truck with a crane mounted on the back. The plaintiff used the truck in a side business that he ran in addition to his regular employment as a firefighter for the city of Groton (city). As the plaintiff drove around a curve on Route 94 near Foote Lane, the work operation came into his view. He braked and swerved his truck; the truck struck the guardrail on the right side of the road, flipped over onto its left side and slid for some distance before coming to rest. The plaintiff was transported to Hartford Hospital (hospital), where he was treated for various injuries, including a fracture in his left front skull near his eye and a hemorrhage on the left side of his brain.

In December, 2002, the plaintiff commenced the present negligence action against the defendant. In his amended complaint, he alleged the following facts. As he drove his truck around the curve on Route 94 near Foote Lane, he encountered the department truck in his westbound lane of travel. At the time, the truck was being operated by a department worker who was employed by the state. The plaintiff swerved his truck in order to avoid striking the department truck. The plaintiff alleged that the state and/or the department had been negligent in that, inter alia, the driver had: "positioned the [department] truck in a dangerous location"; "stopped the truck in the roadway just after a curve"; "failed to move the truck from a dangerous location"; "operated the truck in a dangerous manner"; and "failed to pay attention or look out for approaching vehicles . . . ." The plaintiff further alleged that, as a

tor Co., 33 Conn. App. 99, 103, 633 A.2d 731 (1993), the first appeal is jurisdictionally defective for lack of a final judgment.

result of these negligent acts, he had sustained numerous injuries, including traumatic brain injury, memory loss, and cognitive and concentration problems.

At trial, the plaintiff testified that he was unable to recall the accident and had only vague recollections of the days immediately after the collision while he was in the hospital. To prove liability, the plaintiff proffered testimony of an independent eyewitness to the accident, Linda Guard, and an accident reconstruction expert, Michael Cei. Guard offered the following account of the accident. She had been driving directly behind the defendant when their vehicles approached the "blind" and "very dangerous" corner on Route 94. She was familiar with the road and its speed limit, as she traveled the route twice a day. The plaintiff was driving at or below the speed limit. As Guard drove around the curve, she saw the plaintiff's truck go up on the guardrail, flip over and slide on its side in the westbound lane. The department truck was moving slowly in the westbound travel lane at this time, close enough to the plaintiff that it appeared that his sliding truck would strike it. Guard opined that, had the plaintiff not been in front of her, she could have been involved in the same accident. There were no signs posted to warn drivers of the presence of the department workers. Immediately after the accident, one of the workers had yelled to the driver of the department truck to move the truck; after the driver of the truck complied, the coworker again yelled to move the truck further and for the driver to "get the sign." Guard screamed at the department workers to stop because she thought they were leaving the scene. The driver came to assist the plaintiff only after the driver had moved the department truck and retrieved one of the handheld signs.

The plaintiff also offered the testimony of the three department workers, which reflected certain inconsis-

tencies between their individual accounts and contradictions between their account and Guard's account of the accident. In direct contradiction to Guard's testimony, the three workers testified that the department truck was parked off the road, ahead of the curve in the road where the accident had occurred. Rodrigues testified that, just before the accident, he and Haas were flagging traffic on either side of the mower as Scheller was operating it; Haas was directing westbound traffic behind the mower and Rodrigues was directing eastbound traffic in front of the mower. Rodrigues stated that, when the accident occurred, he had yelled to Scheller to stop the mower. Although the department truck's engine was running when the accident occurred, Rodrigues said he was not in the truck at that time, but he could not provide any estimate of how far he was from the truck. In contrast to Guard's testimony, Rodrigues stated that he had come to the plaintiff's aid immediately after the accident, that he had moved the department truck only after it was evident that the plaintiff needed the assistance of rescue personnel, and that he then had repositioned the department truck to divert motorists from the accident scene. The plaintiff elicited testimony from Scheller regarding the circumstances preceding the accident that differed from Rodrigues' account. Scheller testified that no one was flagging traffic in front of him when the accident occurred, and that he was alerted to the accident, which occurred behind him as he was mowing in the westbound direction, by Rodrigues sounding the department truck's horn behind him.

Finally, to prove damages, the plaintiff proffered the testimony of: Groton deputy fire chief, John Cunningham, who testified regarding impairments in the plaintiff's decision-making ability at work since the accident; the plaintiff's primary care physician, Gary Bertman, who testified as to the plaintiff's various permanent

physical and cognitive impairments caused by the accident; and the plaintiff's optometrist, Steven Rapoport, who testified regarding vision problems caused by the accident. The plaintiff also offered numerous medical records, from the time of his admission to the hospital after the accident in November, 2001, to neurological testing he underwent in 2004.

At the close of the plaintiff's case, the defendant moved for a directed verdict, which the court denied. The defendant then presented its only witness, William Vliet, an accident reconstruction expert. The defendant's argument to the jury, based on evidence it had adduced in its cross-examination of the plaintiff's witnesses and in its direct examination of Vliet, was that the department truck had been parked off the road, as the three department workers had testified, and that the truck was being used as a warning device to alert motorists about the mowing operation, as evidenced by testimony that the truck's strobe lights had been activated. The defendant further contended that the plaintiff's claimed lack of recall was not credible and that his own negligence had caused the accident because his speed was excessive for entering the curve in the road, which was wet.

The jury thereafter returned a verdict in favor of the plaintiff. It found him 10 percent contributorily negligent and awarded $62,497.90 in economic damages and $462,000 in noneconomic damages, for a total of $472,048.11 after the verdict was reduced by the percentage of the plaintiff's negligence. In its interrogatories, the jury answered in the affirmative to questions as to whether the department truck: (1) "was in the travel portion of the highway at the time of the . . . accident"; and (2) "was being 'operated' in the sense that [Rodrigues] was moving the vehicle from one place to another along his designated maintenance route to fulfill his [department] responsibilities . . . ." The jury

answered in the negative to questions as to whether, at the time of the accident: (1) Rodrigues had "parked the [department] truck as an activity incident to moving it from one place to another along his designated maintenance route"; and (2) the department truck "was being used as a warning signal for the mowing operation . . . ." The defendant thereafter filed a motion to set aside the verdict, which the court denied, and the court rendered judgment in accordance with the verdict. Subsequently, the court adjusted the amount of the award to $462,708.35 to reflect collateral source payments received by the plaintiff. These appeals followed. See footnote 3 of this opinion.

On appeal, the defendant asserts numerous claims that fall into three categories. First, the defendant contends that the trial court should have set aside the verdict because the plaintiff failed to prove that negligent "operation" of a state vehicle had caused the accident, the necessary predicate to benefit from the state's waiver of sovereign immunity under § 52-556.[4] Second, the defendant contends that the trial court rendered improper rulings on the following evidentiary issues, thus requiring a new trial: (1) allowing evidence of the movement of the department truck subsequent to the accident in contravention to the rule barring evidence of subsequent remedial measures; (2) permitting Cei, the plaintiff's expert, to testify despite the plaintiff's

[4] We note that the defendant initially had advanced claims in its main brief to this court that General Statutes §§ 14-220, 14-251 and 14-290 exempt the state's maintenance vehicles from negligence actions predicated on slow movement or on remaining stationary on the travel portion of the highway. While the defendant's appeal was pending, this court decided a case in which we rejected that same claim with respect to §§ 14-251 and 14-290. See *Allison* v. *Manetta*, 284 Conn. 389, 403, 933 A.2d 1197 (2007) ("although §§ 14-251 and 14-290 exempt certain operators of equipment from prosecution for a violation of § 14-251, such exemption does not demonstrate that [the state employee's] actions in parking the truck on the highway were not negligent [under § 52-556]"). In light of this decision, the defendant withdrew its claims related to these statutes in its reply brief.

untimely disclosure of Cei as a witness; (3) denying the defendant's request for a continuance to address the late disclosure; (4) precluding the defendant from adducing expert testimony to rebut Cei's untimely disclosed opinions; (5) permitting Cei to testify as to Guard's out-of-court statements; and (6) granting the plaintiff's motion in limine to exclude evidence of the plaintiff's misconduct at work that impeached the plaintiff's veracity generally, and his claim for lost wages in 2004, specifically. Third, the defendant claims that there was no evidentiary support for the jury's award for damages for the plaintiff's 2004 lost wages. We address each of these claims in turn.

I

We begin with the defendant's claim that it was entitled to judgment in its favor because the plaintiff failed to adduce evidence that negligent "operation" of a state vehicle had caused his injuries, as required under § 52-556. The defendant claims that the *only* theory of negligent operation that the plaintiff actually pleaded and advanced at trial—parking the department truck incident to travel in his travel lane—was not proved and therefore the court should have directed a verdict in its favor. Although the defendant recognizes that the jury ultimately rejected the plaintiff's negligent parking theory, it also contends that the failure to direct a verdict on this claim was harmful error because submission of that theory to the jury infected the entire case by obscuring the real issues, causing confusion and forcing the defendant to continue to address the parking issue rather than allow it to bring into sharp focus the negligent movement issue. The defendant also claims that it was entitled to judgment notwithstanding the verdict in favor of the plaintiff on his theory of negligent operation by way of movement of the department truck because Guard's testimony was not competent evidence to establish the proximate cause of the plaintiff's acci-

dent. We conclude that the trial court properly denied the defendant's motion for a directed verdict on the parking claim and properly denied its motion to set aside the verdict on the movement claim.

The defendant must overcome a high threshold to prevail on either a motion for a directed verdict or a motion to set aside a judgment. "Directed verdicts are not favored. . . . A trial court should direct a verdict only when a jury could not reasonably and legally have reached any other conclusion. . . . In reviewing the trial court's decision to direct a verdict in favor of a defendant we must consider the evidence in the light most favorable to the plaintiff. . . . Although it is the jury's right to draw logical deductions and make reasonable inferences from the facts proven . . . it may not resort to mere conjecture and speculation. . . . A directed verdict is justified if . . . the evidence is so weak that it would be proper for the court to set aside a verdict rendered for the other party." (Internal quotation marks omitted.) *Riccio* v. *Harbour Village Condominium Assn., Inc.*, 281 Conn. 160, 163, 914 A.2d 529 (2007). Similarly, "[the trial court] should not set aside a verdict [when] it is apparent that there was some evidence [on] which the jury might reasonably reach [its] conclusion, and should not refuse to set it aside [when] the manifest injustice of the verdict is so plain and palpable as clearly to denote that some mistake was made by the jury in the application of legal principles . . . . Ultimately, [t]he decision to set aside a verdict entails the exercise of a broad legal discretion . . . that, in the absence of clear abuse, we shall not disturb." (Internal quotation marks omitted.) *Allison* v. *Manetta*, 284 Conn. 389, 405, 933 A.2d 1197 (2007).

The legal principles applicable in this case required the plaintiff to establish the predicate to recovery under § 52-556: injuries caused by the negligence of a state employee "when operating a motor vehicle . . . ." We

recently examined this phrase in *Allison* v. *Manetta*, supra, 284 Conn. 397, and cited with approval the Appellate Court's construction "that operation of a motor vehicle occurs when there is a setting in motion of the operative machinery of the vehicle, or there is movement of the vehicle, or there is a circumstance resulting from that movement or an activity incident to the movement of the vehicle from one place to another." (Internal quotation marks omitted.) We concluded that the trial court in that case properly had instructed the jury that, if the state employee had "parked the state truck as an activity incident to moving it from one place to another along his designated maintenance route to fulfill his responsibilities, he was operating the truck as that word is used in § 52-556, even though the truck was parked and he was outside of it at the time of the accident." (Internal quotation marks omitted.) Id., 399. We also concluded, however, that the court's instruction was incomplete because it had failed to indicate that, if the vehicle was being used as a warning device or protective barrier, it was not being operated for purposes of § 52-556. Id., 400.

Turning to the present case, we begin by addressing the defendant's characterization of the plaintiff's theory at trial as being limited to negligent parking incident to travel. We agree with the plaintiff that the record is replete with evidence that he advanced a theory of negligent operation that encompassed both parking incident to travel *and* movement of the department truck. In his amended complaint, the plaintiff alleged that, at the time he encountered the department truck in his travel lane, "the [department] truck was being operated by a [department] worker who was employed by the [s]tate . . . ." He further alleged various specific acts of negligence, some of which clearly related to parking the vehicle, and others that were sufficiently

broad to encompass moving the vehicle, such as "the driver . . . operated the [department] truck in a dangerous manner" and "the driver failed to pay attention or look out for approaching vehicles . . . ." As our discussion in *Allison* v. *Manetta*, supra, 284 Conn. 397, indicates, the term "operation" encompasses both parking incident to travel and movement. We view these allegations mindful that "pleadings must be construed broadly and realistically, rather than narrowly and technically." (Internal quotation marks omitted.) *Violano* v. *Fernandez*, 280 Conn. 310, 318, 907 A.2d 1188 (2006).

The limited construction of the complaint advanced by the defendant on appeal is belied by its second special defense, in which it characterized the plaintiff's claim as "common law negligence relating to parking *and/or slow movement of the [department] truck*." (Emphasis added.) In its motion to amend its special defenses to add this defense, the defendant contended that the amendment was in response to Guard's deposition, in which "testimony was elicited for the first time that the [department truck] may have been moving slowly at the time of the events relevant to the plaintiff's complaint." When the plaintiff asserted in subsequent pretrial discussions with the court that the allegations in his amended complaint were broad enough to cover either movement or parking, the defendant raised no challenge. In his opening and closing arguments to the jury, the plaintiff maintained that the essential fact in the case was the location of the department truck in his travel lane, and that the jury could find that the department truck was either parked or moving in that lane.[5] The defendant acknowledged both theories in its

---

[5] It appears from the record that the plaintiff initially took the position that it did not matter whether the jury found that the department truck had been moving or had been parked because he assumed that the defendant did not intend to, or could not, raise as a defense that the truck was parked for use as a warning device. At the close of his case, the plaintiff argued to the trial court that, because the defendant had filed a motion to dismiss without asserting that the truck was being used as a warning device, its

opening arguments to the jury. Therefore, we reject the defendant's contention that the only theory of negligent operation that the plaintiff advanced at trial was the one that the jury found he had not proved.

We also disagree with the contention that the trial court improperly failed to direct a verdict on the negligent parking claim. Despite the jury's rejection of that claim, the defendant contends that, because there was no competent evidence of negligent parking, the trial court should not have submitted that claim to the jury and thereby caused confusion that prejudiced the defendant in addressing negligent movement of the vehicle. The defendant appears to take the position that the jury was required to credit or reject in toto the testimony of Guard or the department workers. It is well established, however, that the trier of fact may credit part of a witness' testimony and reject other parts. *State* v. *Medina*, 228 Conn. 281, 310, 636 A.2d 351 (1994); *Barrila* v. *Blake*, 190 Conn. 631, 639, 461 A.2d 1375 (1983); *Boccanfuso* v. *Conner*, 89 Conn. App. 260, 292, 873 A.2d 208, certs. denied, 275 Conn. 905, 882 A.2d 668 (2005). Therefore, the jury was free to credit Guard's testimony as to the location of the department truck in the plaintiff's travel lane while at the same time crediting the testimony of the department workers that none of them was driving the truck at the time of the accident. Accordingly, because the trial court properly submitted the negligent parking claim to the jury, we need not consider the defendant's contention that the improper submission prejudiced it with respect to the negligent movement claim.

---

failure to do so constituted a judicial admission. The defendant did not assert as a special defense that the truck was being used as a warning device. The trial court rejected the plaintiff's waiver argument, and interrogatories thereafter were submitted to the jury regarding both parking and movement, along with the issue of whether the truck was being used as a warning device.

Turning to the claim on which the jury did find in favor of the plaintiff—negligent operation by way of moving the truck—we conclude that there was sufficient evidence to support the verdict. As we previously have noted, Guard testified that she was driving directly behind the plaintiff's vehicle at the time of the accident. She repeatedly stated that she was certain that the department truck was in the westbound travel lane, in front of the plaintiff's truck, when the accident occurred and that she had seen the department truck moving slowly in that lane within the five or ten seconds that it took her to pull her car off the road to assist the plaintiff, as the plaintiff's truck was sliding to a stop. Guard further stated that the department truck was close enough in front of the plaintiff's truck that she thought his truck would strike it, and that the plaintiff did not do so only because the department truck kept moving. On the basis of Guard's testimony, the jury reasonably could have inferred that, if the department truck was moving seconds after the accident, it was moving seconds earlier as the accident was occurring. See *Considine* v. *Waterbury*, 279 Conn. 830, 871 n.23, 905 A.2d 70 (2006) ("[W]e must determine, in the light most favorable to sustaining the verdict, whether the totality of the evidence, including reasonable inferences therefrom, supports the [trier's] verdict . . . . In making this determination, [t]he evidence must be given the most favorable construction in support of the verdict of which it is reasonably capable. . . . In other words, [i]f the [trier] could reasonably have reached its conclusion, the verdict must stand, even if this court disagrees with it." [Internal quotation marks omitted.]). Although the defendant attempted to undermine Guard's testimony by exploiting inconsistencies between her deposition testimony and her trial testimony, particularly with respect to the distance between her vehicle and the plaintiff's vehicle, Guard was adamant that she could

see the department truck in the westbound lane when the plaintiff's truck flipped on its side after striking the guardrail. Cei, the plaintiff's accident reconstruction expert, corroborated that Guard could have been in a position to view the department truck in the travel lane from her vantage point.

The defendant mistakenly relies on a line of cases in which this court concluded that the plaintiff could not prevail in the absence of "evidence that [the alleged negligent act] actually had caused the collision . . . [when there] are a number of factual possibilities that could explain how the accident occurred." *Winn* v. *Posades*, 281 Conn. 50, 60, 913 A.2d 407 (2007). The defendant posits that, because the plaintiff stated that he had no recollection of what caused him to swerve his truck, the same possibilities exist in the present case. The paramount difference between the cases cited by the defendant and the one presently before us, however, is that the plaintiff in the present case proffered an eyewitness to the accident. Compare id., 56 (no proof of negligence in two car collision at intersection when "[the defendant] was unable to recall how the accident happened, the [plaintiff's] decedent never regained consciousness, and there were no witnesses to the accident"); *Toomey* v. *Danaher,* 161 Conn. 204, 207, 286 A.2d 293 (1971) (no proof of negligence when driver had died as result of injuries sustained in accident, plaintiff passenger was unable to recall anything about accident due to amnesia, and no eyewitnesses to accident); *Palmieri* v. *Macero,* 146 Conn. 705, 706–708, 155 A.2d 750 (1959) (no proof of negligence when driver of motor vehicle that went over embankment did not survive accident, plaintiff passenger was asleep at time of accident, and no other witnesses to accident) with *Terminal Taxi Co.* v. *Flynn,* 156 Conn. 313, 317–18, 240 A.2d 881 (1968) (sufficient evidence of negligence when plaintiff was struck from behind by defendant's

car and plaintiff proffered testimony as to what he had seen immediately before accident occurred and evidence as to physical facts in police officer's accident report). Under the defendant's view, the plaintiff could not prevail even if Guard had made her observations as a passenger seated next to the plaintiff, but this court never has taken such a restrictive view of proximate cause. The standard is not that the plaintiff must remove from the realm of possibility all other potential causes of the accident; rather, it is that the plaintiff must establish that it is more likely than not that the cause on which the plaintiff relies was in fact a proximate cause of the accident. See *Winn* v. *Posades*, supra, 57 ("This court has recognized that in a case involving an automobile accident, [a] plaintiff cannot merely prove that a collision occurred and then call upon the defendant operator to come forward with evidence that the collision was not a proximate consequence of negligence on his part. Nor is it sufficient for a plaintiff to prove that a defendant operator might have been negligent in a manner which would, or might have been, a proximate cause of the collision. A plaintiff must remove the issues of negligence and proximate cause from the field of conjecture and speculation." [Internal quotation marks omitted.]). Guard's testimony was competent evidence that the unexpected presence of the department truck moving slowing in the westbound travel lane more likely than not caused the plaintiff to swerve his truck to avoid a collision. Accordingly, the trial court properly denied the defendant's motion to set aside the verdict on this ground.

II

We next address the defendant's numerous challenges to the trial court's evidentiary rulings. In so doing, we are mindful that "[t]he trial court has broad discretion in ruling on the admissibility . . . of evidence . . . [and its] ruling on evidentiary matters will

be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . Furthermore, [b]efore a party is entitled to a new trial because of an erroneous evidentiary ruling, he or she has the burden of demonstrating that the error was harmful. . . . The harm[ful] error standard in a civil case is whether the improper ruling would likely affect the result." (Internal quotation marks omitted.) *Desrosiers* v. *Henne*, 283 Conn. 361, 365–66, 926 A.2d 1024 (2007); accord *State* v. *Sawyer*, 279 Conn. 331, 357, 904 A.2d 101 (2006) (improper evidentiary ruling is harmless in criminal case if reviewing court has fair assurance that it did not substantially affect jury's verdict).

We conclude that most of the defendant's evidentiary claims are without merit and that the defendant has not met its burden of proving that, even if the trial court abused its discretion with respect to some of these rulings, it is likely that the result would have been different had the defendant prevailed in these evidentiary rulings. See *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, 265 Conn. 79, 96, 828 A.2d 31 (2003) (considering whether improper exclusion of testimony "would likely have affected the outcome of the trial"); *Danko* v. *Redway Enterprises, Inc.*, 254 Conn. 369, 383, 757 A.2d 1064 (2000) (considering "whether it is reasonably likely that the result in this case would have been different" had evidence been admitted).

A

We begin with the defendant's claim that the trial court improperly permitted the plaintiff to introduce evidence that the department truck was moved after the accident because this evidence falls within the subsequent remedial measure exclusion. The plaintiff con-

tends that this action did not constitute a subsequent remedial measure and this evidence was admissible for various other reasons. We agree with the plaintiff.

"The general rule is that evidence of subsequent repair is not admissible on the issue of negligence. . . . This court, however, has admitted evidence of subsequent remedial measures if offered for other purposes . . . . [T]he rule barring evidence of subsequent repairs in negligence actions is based on narrow public policy grounds, not on an evidentiary infirmity. . . . It presupposes that to admit evidence of subsequent repairs to an identified hazardous condition as proof of negligence penalizes the defendant for taking remedial measures. This discourages alleged tortfeasors from repairing hazards, thereby perpetuating the danger. This policy fosters the public good by allowing tortfeasors to repair hazards without fear of having the repair used as proof of negligence . . . .

"Even in negligence actions, however, we have held proof of subsequent remedial measures admissible if offered for a purpose other than to show culpable conduct on the part of a defendant. . . . The existence of these exceptions to the general rule illustrates that the strength of the public policy supporting the rule is not so great as to demand the exclusion where there is a strong probative use for the evidence, as contrasted with the somewhat dubious legal relevance of subsequent repairs to the question of negligence itself." (Citations omitted; internal quotation marks omitted.) *Smith* v. *Greenwich*, 278 Conn. 428, 447–48, 899 A.2d 563 (2006).

We agree with the plaintiff that moving the department truck was not a subsequent remedial measure in light of the plaintiff's claim and the evidence adduced at trial. The plaintiff produced evidence to support his claim that the truck was in the westbound travel lane

as he approached the department's work site. The evidence established that, after the accident, the plaintiff's truck was on its side, blocking the entire westbound lane, with the department truck ahead of him in that lane. Accordingly, should any other vehicle have approached the accident scene in the westbound travel lane, it was the *plaintiff's* truck that blocked the road and hence posed the danger to oncoming vehicles. Therefore, moving the department truck from its position on the other side of the plaintiff's vehicle would not have remedied the danger posed by the presence of the department truck prior to the accident. Indeed, removing the department truck from the accident scene entirely, before police arrived, would in any event go beyond a remedial measure and cross over into destruction of relevant evidence. See *Leonard* v. *Commissioner of Revenue Services*, 264 Conn. 286, 306, 823 A.2d 1184 (2003) ("we have recognized that an adverse inference may be drawn when relevant evidence is intentionally destroyed").

Moreover, the evidence was relevant to issues other than negligence: (1) to impeach Rodrigues' credibility generally by impeaching his testimony that he had come to the plaintiff's aid immediately after the accident occurred; (2) to explain why the police photographs of the scene, the accompanying sketch of the accident scene and accounts of the accident by emergency responders did not reflect that the truck was at the scene; and (3) to address a contested fact, namely, whether the truck was in the road, not whether it was negligent to be there.[6] See *Rokus* v. *Bridgeport*, 191 Conn. 62, 66, 463 A.2d 252 (1983) (The bar on subsequent repairs precludes such evidence "when offered

---

[6] Although the plaintiff did remark during closing argument that the department workers had moved the truck to cover up their improper action, he also argued that the truck was not in the road when the police arrived because it had been moved.

to prove negligence. It does not exclude such evidence when offered to prove some other material issue.''). Therefore, the trial court did not abuse its discretion in admitting this evidence.

## B

The defendant also challenges the trial court's rulings regarding expert testimony, specifically: (1) permitting Cei, the plaintiff's accident reconstruction expert, to testify; and (2) denying the defendant's request to use Glastonbury police officer Mark Catania as an accident reconstruction expert to rebut Cei's testimony.[7] The defendant contends that the court should not have permitted Cei to testify because the plaintiff's disclosure was untimely, the disclosure raised a new issue that was not responsive to the defendant's timely disclosed expert's opinion—the actual speed of the plaintiff's vehicle—and the defendant was deprived of an opportunity to obtain expert testimony to address this issue. We disagree that the trial court abused its discretion regarding these rulings. The record reveals the following additional facts. Under the trial court's March 1, 2005 scheduling order, the plaintiff was to disclose his expert witnesses by May 11, 2005, and the defendant was to disclose its expert witnesses by July 15, 2005. On February 28, 2005, the plaintiff disclosed several experts on the issue of damages, but none on the issue of liability.

---

[7] The defendant also contends that the trial court abused its discretion in denying the defendant's request for a continuance to meet the late disclosure of Catania as an expert witness. We conclude that the defendant has not preserved this issue for appellate review, however, because the trial court did not rule on the defendant's request, and the defendant never sought an articulation to obtain a ruling. See *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 232, 828 A.2d 64 (2003) (''It is . . . the responsibility of the appellant to move for an articulation or rectification of the record where the trial court has failed to state the basis of a decision . . . to clarify the legal basis of a ruling . . . or to ask the trial judge to rule on an overlooked matter. . . . In the absence of any such attempts, we decline to review this issue.'' [Internal quotation marks omitted.]).

On July 14, the defendant disclosed William Vliet as an expert witness on the subjects of road geometry, sight distance, stopping distances, stopping sight distances and witness ability to observe. The disclosure stated in relevant part: "It is anticipated that [Vliet] will testify, based upon his review of various conditions at the location of [the] plaintiff's accident, including the road geometry, coefficient of friction and sight distance calculations, that had [the plaintiff] been proceeding at the speed limit or slower he would have had sufficient opportunity to perceive, react and stop his vehicle prior to encountering any object in, upon or off the side of the roadway at the place of this incident and thereby avoid his accident." In response, the plaintiff filed a motion seeking either: (1) to preclude Vliet's testimony because the defendant had raised a new issue on the last day of the scheduling order and less than one month before trial; or (2) to obtain a more detailed statement to present to its own expert that it now would have to retain. The defendant filed a supplemental disclosure on July 26, 2005. On August 17, the plaintiff disclosed Cei as his accident reconstruction expert, but stated that Cei's facts and opinions would be disclosed after Cei's review and analysis. On August 24, after the defendant filed a motion to preclude, the plaintiff filed a disclosure stating the anticipated substance of Cei's testimony, including his opinion that there was no indication that the plaintiff was speeding and that the plaintiff would not have been able to avoid the accident had he been traveling the speed limit of forty-five miles per hour. The court denied the motion to preclude.

On September 19, 2005, after taking Cei's deposition and learning that he had formed an opinion as to the actual speed of the plaintiff's truck at the time of the accident, the defendant filed a motion to preclude Cei's testimony as it related to that issue. The defendant contended that the plaintiff was introducing, through

an untimely disclosed expert, a new issue that had not been raised in Vliet's disclosure. On September 20, the day before trial commenced, the trial court heard argument on the defendant's motion to preclude. The court concluded that, because Vliet's disclosure "is based on speed, includes speed . . . [and] [t]he plaintiff's disclosure also includes speed . . . both experts can testify about speed."

On the first day of trial, after the court heard an offer of proof regarding certain testimony by Officer Catania, who had been dispatched to the accident scene and thereafter prepared an accident report, the defendant orally sought permission to use Catania as an accident reconstruction expert. The court sustained the plaintiff's objection, and denied the defendant's request on the ground that it was untimely.

It is well settled that "[t]he trial court has wide discretion in ruling on the admissibility of expert testimony and, unless that discretion has been abused or the ruling involves a clear misconception of the law, the trial court's decision will not be disturbed." (Internal quotation marks omitted.) *Viera* v. *Cohen*, 283 Conn. 412, 444, 927 A.2d 843 (2007). "The rules of practice authorize [preclusion of expert testimony as a] sanction for late disclosure of an expert witness on a motion of the opposing party if 'the judicial authority determines that the late disclosure (A) will cause undue prejudice to the moving party; or (B) will cause undue interference with the orderly progress of trial in the case; or (C) involved bad faith delay of disclosure by the disclosing party. . . .' Practice Book § 13-4 (4)." *Vitone* v. *Waterbury Hospital*, 88 Conn. App. 347, 355–56, 869 A.2d 672 (2005).

We conclude that the trial court did not abuse its discretion in permitting Cei to testify. The trial court properly viewed the defendant's disclosure of Vliet as

having raised the issue of speed. By opining that the plaintiff would have been able to avoid the accident had he been traveling at or below the speed limit, Vliet's testimony necessarily was implying that the plaintiff was traveling above the speed limit, even though he did not intend to offer an opinion as to how much above that limit. To the extent that the defendant believed that it would be unduly prejudiced by Cei's testimony offering an opinion as to the plaintiff's speed at the time the accident occurred,[8] the defendant did not thereafter press the issue with the court by explaining how Cei's testimony would differ materially from Vliet's as to that subject matter. Moreover, the defendant does not dispute the trial court's findings in its articulation of the denial of the motion to set aside the verdict that: the defendant was able to depose Cei prior to trial; Vliet had an opportunity to review that deposition, which disclosed Cei's opinions and calculations; Vliet testified that he had tested Cei's calculations; and Vliet offered an opinion that Cei's estimate should have been higher. Finally, the jury's finding that the plaintiff was 10 percent contributorily negligent indicates that it likely concluded that the plaintiff's speed had played some role in the accident. We therefore conclude that the trial court did not abuse its discretion in determining that the defendant was not unduly prejudiced by Cei's untimely disclosure.

We also conclude that the trial court did not abuse its discretion in denying the defendant's request to offer Catania as an expert. The substance of Catania's opinion previously had not been disclosed, trial already had commenced and delay of the proceedings inevitably

---

[8] Cei testified that he had estimated, on the basis of normal braking reaction times, the skid marks in the road, the site line, the weight of the plaintiff's truck and Guard's description of the department truck's location, that the plaintiff had been driving between 35 and 41.5 miles per hour at the time the accident occurred. The speed limit on that portion of the road was 45 miles per hour.

would have ensued. See *Precision Mechanical Services, Inc.* v. *Shelton Yacht & Cabana Club, Inc.*, 97 Conn. App. 258, 265, 903 A.2d 692 (no abuse of discretion to preclude expert disclosed after trial had commenced and opposing party had presented majority of its case-in-chief), cert. denied, 280 Conn. 928, 909 A.2d 524 (2006); *Tornaquindici* v. *Keggi*, 94 Conn. App. 828, 848, 894 A.2d 1019 (2006) (no abuse of discretion to preclude expert testimony when disclosure was not filed properly until one week before jury selection was to begin); see also Practice Book § 13-4 (4) (requiring expert disclosure "within a reasonable time *prior to trial*" [emphasis added]).

C

The defendant also claims that the trial court improperly permitted Cei to testify as to out-of-court statements by Guard regarding her account of the accident. The defendant contends that Cei's testimony contained inadmissible hearsay and improperly bolstered Guard's credibility on a critical fact at trial, namely, whether the department truck was in the travel lane of the road. Specifically, the defendant points to the following testimony elicited from Cei on direct examination:

"Q. Can you give us an estimate, sir, of where [Guard] stated that she saw the [department] truck in the road?

"A. Yes. To orientate ourselves again [on the photograph of the site of the accident], this guardrail that I pointed out earlier, the [plaintiff's] truck comes to rest at the end of this guardrail, in that general vicinity. And it was from that point—somewhere from that point going up on the photograph, which is north, to a point further beyond that sign that we just looked at; in this area that I'm going back and forth."

Thereafter, on redirect examination, the plaintiff elicited the following testimony from Cei:[9]

"Q. And did [Guard] ever waiver that the reason why [the plaintiff] took evasive action was because—is because there was a [department] truck in the road?

"A. No."

We need not address this claim at any length because it is clear that the admission of these isolated statements did not constitute harmful error. As to the first exchange, Cei already properly had testified that Guard was at the scene and that he had interviewed her to obtain information that he had relied upon to make his calculations. See *State* v. *Copas*, 252 Conn. 318, 328, 746 A.2d 761 (2000) ("[a]lthough some of the facts considered by the experts . . . may not [be] substantively admissible . . . the parties [are] not precluded from examining the experts about those facts insofar as they related to the basis for the experts' opinions" [citations omitted]); *State* v. *Henry*, 27 Conn. App. 520, 529, 608 A.2d 696 (1992) ("[i]nformation on which an expert relied that is not offered for its truth but is offered to show that the expert relied on it is not hearsay and may be the subject of proper cross-examination to test the basis of that expert's opinion"). The jury necessarily would have inferred that, if Cei had based his calculations on the department truck being in a particular location, this information had come from Guard. Moreover, during Cei's direct examination, the trial court specifically instructed the jury that statements Guard

---

[9] The defendant also claims that the two questions and responses that preceded this exchange were improper. Because the record reveals that the defendant did not object to these exchanges, however, any claim of impropriety has not been preserved for appellate review. See *State* v. *Lizotte*, 200 Conn. 734, 742A, 517 A.2d 610 (1986) ("[w]e consistently have stated that we will not consider evidentiary rulings where counsel did not properly preserve a claim of error by objection and exception"); see, e.g., *Travelers Ins. Co.* v. *Namerow*, 257 Conn. 812, 831–32, 778 A.2d 168 (2001).

had made to Cei were not being used for the truth of the matter, but, rather, to establish the basis of his opinion. With respect to the second exchange, we note that the defendant did not object to two questions that preceded the contested exchange, in which the plaintiff solicited substantially similar responses. In addition, Guard repeatedly stated that she was "certain" and "positive" that the department truck was in the road, and there was no evidence that she ever had made a statement to the contrary. Accordingly, admission of these two statements was not harmful error.

## D

We turn to the defendant's final evidentiary claim, namely, that the trial court improperly granted the plaintiff's motion in limine to exclude evidence of his misconduct at work relating to acts of dishonesty, which, at least in part, had led to the plaintiff being placed on a one year probation period. The defendant claims that this evidence should have been admitted to impeach the plaintiff's veracity with respect to his claimed loss of memory of the accident. The defendant also contends that this evidence was admissible to establish whether the plaintiff's absence from work in 2004, for which the jury awarded damages, actually was due to "his desire to avoid termination for violation of the [city's] [c]ode of [c]onduct during the probationary period rather than due to any injuries." The plaintiff responds that the defendant failed to preserve this issue for review, and even if it did preserve the issue, the trial court properly excluded the evidence as irrelevant and highly prejudicial. We conclude that the defendant preserved the issue for appeal, and that the trial court abused its discretion in excluding this evidence, but that this impropriety was not harmful error, even when viewed in conjunction with the harmless error discussion in part II C of this opinion.

The record reveals the following additional undisputed facts and procedural history. During the relevant period, the plaintiff was a captain with the city fire department. Prior to trial, the court heard argument on the plaintiff's motion in limine seeking to preclude the defendant from introducing, inter alia, three documents from the plaintiff's personnel records regarding misconduct at work and eliciting testimony related thereto. The first exhibit was a January, 1999 letter from the chief of the city's fire department, Nicholas DeLia, documenting that the plaintiff had received a verbal reprimand for abusing his sick time by taking paid sick leave on December 24, 1998, when he was, in fact, out of town. The letter indicated that, in the fact-finding interview, the plaintiff ultimately admitted that he had been untruthful in conversations with DeLia relating to that matter. The second exhibit was a June 16, 2000 letter signed by DeLia reprimanding the plaintiff for failing to follow overtime rules by assigning himself overtime on one occasion, rather than offering it to other workers in his bargaining unit. The letter indicated that, at a meeting to discuss the overtime, the plaintiff admitted that he had decided not to follow the overtime rules. The third exhibit was an October 10, 2003 letter from the city's mayor formally notifying the plaintiff that he was being suspended from work for twenty-one days and was being placed on probationary status for a one year period ending October 5, 2004. The stated reason for the discipline was that the plaintiff had "violated the [c]ity's Internet [u]se [p]olicy and then lied about [his] [I]nternet and email use repeatedly when interviewed." The plaintiff's conduct was deemed to violate provisions of the city's code of conduct relating to honest and ethical conduct. The letter further specified: "[Y]ou were dishonest in the investigation when you stated on three separate occasions in the interview that your purpose in visiting the inappropriate websites dur-

ing work time was only to chat on-line with women and was not sexual in nature. . . . I note that you have received discipline for: failure to follow work rules; dishonesty; abuse of sick time; [c]ode of [c]onduct violations and harassment. . . . If your performance does not improve you may be removed from your position as [c]aptain and/or subject to future discipline, up to and including termination of employment."

At the hearing on the plaintiff's motion in limine, in response to the plaintiff's claim of prejudice, the defendant agreed to redact from the October, 2003 letter any references to the plaintiff's use of the Internet or the subject matter relating to that use, but maintained its request to use the portion of the letter referencing the underlying violations and the reasons for the suspension. The plaintiff objected to any use of the three exhibits as irrelevant and prejudicial. The defendant responded that the evidence was relevant to impeach the plaintiff's veracity and his claim that he had lost wages in 2004 because of the accident. Although the court apparently ruled on the motion off the record, the defendant subsequently stated on the record its understanding that the court had ruled against the defendant. Thereafter, in response to the defendant's request for an articulation after the court had denied the defendant's motion to set aside the verdict, the court provided the following explanation of its ruling on this issue: "[T]he court decided that these matters were collateral, and that delving into them could have created a side-issue trial the result of which could have unduly prolonged the trial on the main issues, and produced a product that could have been more prejudicial than probative."

In view of the aforementioned record, we disagree with the plaintiff's contention that the defendant failed

to preserve this issue.[10] Turning to the admissibility of the evidence, we are mindful that the defendant intended to use the evidence for two purposes. First, it intended to impeach the plaintiff's veracity as to his claimed lack of memory regarding the accident. Second, it intended to impeach the plaintiff's testimony that his wage loss in 2004 was related to the accident.

It is well established that "[a] witness may be impeached by specific acts of misconduct that evidence a lack of veracity." C. Tait, Connecticut Evidence (3d Ed. 2001) § 6.32.2, p. 459; see Conn. Code Evid. § 6-6 (b). Testimony regarding such matters properly may be elicited through cross-examination, but extrinsic evidence of specific acts of misconduct is not admissible to impeach veracity. Conn. Code Evid. § 6-6 (b) (2); *State* v. *McGraw*, 204 Conn. 441, 446, 528 A.2d 821 (1987); *State* v. *Guthridge*, 164 Conn. 145, 157, 318 A.2d 87 (1972), cert. denied, 410 U.S. 988, 93 S. Ct. 1519, 36 L. Ed. 2d 186 (1973); *Martyn* v. *Donlin*, 151 Conn. 402, 408, 198 A.2d 700 (1964). "Where, however . . . the prior acts of misconduct are relevant to a substantive or material issue in the case, the prior acts can be proven by extrinsic evidence, despite the fact that admission of that evidence directly contradicts the testimony of the state's witness, thereby also raising questions as to his or her credibility." *Demers* v. *State*, 209 Conn. 143, 157, 547 A.2d 28 (1988).

Before turning to the defendant's claims, we conclude that only two of the three exhibits cited by the defendant

---

[10] The plaintiff also posits, however, that the defendant waived its right to pursue this issue on appeal by failing to cross-examine either him or Cunningham, the deputy fire chief for the city, regarding the misconduct and probation. We disagree. Given the trial court's decision to grant the motion in limine, which also expressly sought to preclude "the asking of questions" on that issue, it appears that the defendant simply was adhering to the trial court's ruling. The defendant could have asked Cunningham, however, whether the plaintiff had a reputation for truthfulness; see Conn. Code Evid. § 6-6 (a); but it did not do so.

bear on the plaintiff's veracity or any issue at trial, and we therefore limit our consideration to the exclusion of those two exhibits: the January, 1999 letter regarding abuse of sick leave and the October, 2003 letter regarding formal discipline for violating the city's code of conduct regarding honest and ethical behavior. The June 16, 2000 letter reprimanding the plaintiff for failing to follow overtime rules did not reflect on the plaintiff's veracity. It indicates that he did not misrepresent any facts initially and that he thereafter admitted that he had not followed the rules. Therefore, the trial court properly precluded the defendant from using that evidence. See *Vogel* v. *Sylvester*, 148 Conn. 666, 676, 174 A.2d 122 (1961) ("unless particular acts of misconduct are indicative of a lack of veracity, it is error to permit cross-examination concerning them, however much they may be indicative of bad moral character"). With this in mind, we first turn to the use of this evidence for purposes of determining the plaintiff's liability for the accident and then to its use for purposes of determining lost wage damages.

1

We first consider whether the trial court abused its discretion in precluding the defendant from using the evidence of the plaintiff's prior acts of dishonesty to impeach the plaintiff's veracity, specifically as to his claimed lack of memory regarding the accident. Although the plaintiff did not offer his own account of the accident to prove the defendant's liability and therefore the jury was not evaluating the truth of that account, the plaintiff's veracity was nonetheless relevant to liability. Had the jury believed that the prior misconduct tended to prove that the plaintiff was not a truthful person, it may have concluded that the plaintiff was being untruthful as to his inability to recall the accident. That conclusion in turn may have led the jury to draw an adverse inference, namely, that if the plaintiff

was not being truthful about his inability to recall the accident, what he did recall was unfavorable to his case. Indeed, the defendant argued to the jury that it should not credit the plaintiff's testimony and pointed to evidence that it contended undermined the plaintiff's claimed lack of memory regarding the accident. Therefore, the misconduct evidence was probative of a disputed, relevant issue. We further conclude that the defendant's agreement to redact portions of the October, 2003 letter relating to the plaintiff's Internet use sufficiently would have remedied undue prejudice.

We conclude, however, that the defendant has not established that, had this evidence been admitted, it is likely that the jury would have found the defendant not liable. As we previously have noted, the plaintiff's case for the defendant's liability was not dependent on his testimony. The jury evidently found the account of the accident relayed by Guard to be credible and that of the department workers not to be credible as to the essential fact of the location of the department truck. Even if the jury would have concluded from the misconduct evidence that the plaintiff is not a truthful person, it still would have had these accounts to consider. We also question whether the subjects about which the plaintiff had been untruthful—claiming once to be sick when he actually was out of town and claiming that his misuse of the Internet at work was for a less improper purpose than that which was alleged by the city—would have led the jury to conclude that the plaintiff generally was an untruthful person who would lie under oath about his ability to recall the accident.[11] Indeed, all of the documentation relating to the plaintiff's treatment

[11] We think that it is reasonably likely that, had the trial court permitted the defendant to elicit testimony regarding the October, 2003 letter sanctioning the plaintiff for dishonest conduct, the plaintiff would have declined the defendant's offer to eliminate any reference to the conduct that had led to the sanction to avoid speculation on the jury's part that the dishonesty related to an issue more germane to the case.

in the immediate aftermath of his accident—from the time the emergency medical technicians (EMTs) appeared on the scene, to the time the plaintiff was admitted to the hospital and through his discharge from the hospital—reflects that the plaintiff reported having no memory of the accident, and none of these reports suggest that the physicians questioned his memory loss as inconsistent with the head trauma he had sustained in the accident.[12]

Most importantly, it is apparent that the jury necessarily did not credit evidence that the defendant did proffer to demonstrate that the plaintiff actually could recall the accident and that his recollections proved that the state was not responsible for his injuries. Specifically, the state introduced evidence of statements allegedly made by the plaintiff that, *if credited*, could have indicated that he in fact did recall the accident. Although we have no reason to doubt that the jury credited the fact that the plaintiff had made these statements, as the discussion that follows demonstrates, because the accounts of the accident therein were inconsistent with evidence adduced at trial about the accident, it seems likely that the jury concluded that these statements were not a product of the plaintiff's independent recollection, but, rather, a product of con-

---

[12] Two reports by EMTs who treated the plaintiff reflect that, when they arrived at the accident scene, the plaintiff was conscious but confused and unable to recall the incident. After the plaintiff was transported to the hospital and admitted to the trauma unit, the trauma physician's initial impressions were that the plaintiff had a closed head injury, retrograde amnesia and concussion syndrome. The plaintiff did not open his eyes spontaneously, but would do so on command, and he was able to speak coherently in response to questions, but would answer "inappropriately." Tests revealed that the plaintiff had sustained a facial fracture and a hemorrhage on his brain. Although a neurological consultation undertaken on November 30, 2001, indicated that the plaintiff's "cognitive/memory [impairment was] intact," the hospital records for December 1 indicate that the plaintiff had "no memory of [the motor vehicle accident]" and "was largely amnestic to the [accident]."

fusion and misinformation that the plaintiff had received about the accident. Given that the defendant vigorously had pressed the issue of the plaintiff's veracity as to his lack of recollection, we are not convinced that the jury likely would have reached a different conclusion had the state been permitted to proffer the misconduct evidence.

The state introduced the following evidence to impeach the plaintiff's testimony that he could not recall the accident. Officer Catania had written an accident report in which he stated: "Upon police interview at [the hospital on November 30, 2001, the plaintiff] did not 'remember a thing' as to what transpired. . . . [He] would later say his truck 'fishtailed' when he applied the brakes upon seeing the [department] worker cutting the grass." Testimony from Guard and Scheller, the driver of the mower, however, indicate that the plaintiff would not have seen the mower from his vantage point. Guard testified that there was no mower at the site; she never had seen it and only had seen the department truck directly in front of the plaintiff's truck. Scheller's testimony placed the mower at a fair distance ahead of the department truck, which was situated in front of the plaintiff's truck.[13] Although Catania testified that he had no independent recollection of the conversation in which the plaintiff had made the later statement, and therefore could not confirm when the plaintiff had made it, the report was dated November 30, 2001, the day after the accident, at which time the plaintiff still was in the hospital and medicated for pain. Had the plaintiff or his family asked the EMTs, police or hospital personnel who had received an account of the accident from those persons what had happened in the accident, they

[13] Scheller had testified that, although he could see the department truck as he walked back toward the accident site, he was able to see the plaintiff's truck, which was on its side in the westbound lane, only after he got near the department truck and the center of the road.

likely would have been told that there was a mower at the scene, but would not have been told about the department truck because Rodrigues had moved the truck before the EMTs and police arrived at the scene. Moreover, because Catania had no recollection of the conversation in which the plaintiff had made this statement, there was no way to examine him to determine whether the statement was a product of the plaintiff's independent recollection or based on information he had received second hand.[14]

The defendant also pointed to Bertman's notes, describing the plaintiff's first postaccident visit for medical treatment on January 3, 2002. These notes indicated that the plaintiff had been in an accident in which his truck had turned 360 degrees and he had fallen out of the driver's side of the vehicle. The evidence clearly established, however, that the plaintiff did not fall out of the driver's side of his truck. The photographs of the accident scene, the two reports from the EMTs and testimony from Rodrigues and Guard establish that the plaintiff had to be cut out of his seat belt and pulled from the vehicle, which was resting on the driver's side. Therefore, given the aforementioned factors—evidence undermining the accuracy of the statements in the police report and Bertman's notes, the medical records confirming the plaintiff's loss of memory from the time the EMTs arrived at the scene, the jury's crediting of Guard's account of the accident over the account of the department workers, and the marginally probative nature of the misconduct evidence—we conclude that

---

[14] We are mindful that, on cross-examination, Catania also stated that he recalled having a conversation at some unspecified time after the plaintiff was released from the hospital, wherein the plaintiff could recall some aspect of what had happened in the accident, but Catania did not disclose the substance of those recollections because they pertained to a matter that the trial court had ruled inadmissible. Given that this subject matter was deemed inadmissible, we think it is likely that the jury simply disregarded this testimony as not bearing on a relevant issue before it.

the defendant has not met its burden of proving that admission of the misconduct evidence likely would have convinced the jury that the plaintiff was being untruthful about his inability to recall the accident and in turn would have affected the jury's verdict as to liability.

2

We next turn to the question of whether the misconduct evidence should have been admitted to impeach evidence on damages, specifically, the plaintiff's claim that his wage loss in 2004 was causally related to the accident. The record reveals that the plaintiff introduced the following uncontested evidence to support his claim of lost wages for 2004. While the plaintiff was out of work during his recovery period following the accident, from November 29, 2001, through May 2, 2002, the plaintiff used accrued paid sick leave from the city to cover his normal base wages.[15] On February 19, 2004, the plaintiff went out of work on unpaid family medical leave, and remained out on leave until November 10, 2004, at which time he returned to full active duty. Because the plaintiff had used paid sick leave to cover his absence during his recovery period following the accident, he only had enough paid sick leave to cover his family medical leave from February 19, 2004, through April 16, 2004. His lost earnings for the remaining period he was out on leave—April 17, 2004, through November 10, 2004—were $32,451.84, the precise amount of past lost wages the jury awarded to the plaintiff.

The plaintiff took the family medical leave after an incident occurred at work. Specifically, in December, 2003, the plaintiff had permitted a truck to be taken out that had an air leak in its braking system. As a

---

[15] The plaintiff's sick leave did not cover overtime pay that would have been available to him had he been working during this time. The jury, however, did not award the plaintiff any damages for lost overtime.

result of the incident, which raised safety concerns, an investigation was undertaken that possibly could have led to the plaintiff's termination. The investigation revealed evidence that the plaintiff had been present when there was some discussion about taking the truck out of service, but he claimed to have no recollection of hearing that conversation. The plaintiff, his bargaining unit and the city thereafter entered into an agreement under which the plaintiff was required to see a neurologist and undergo neuropsychological testing at the Yale Neurology Clinic to determine his fitness to return to duty.

In January, 2004, Bertman referred the plaintiff to Steven Novella, a physician at the Yale Neurology Clinic. In early March, 2004, the plaintiff was examined by Novella and Mark Andreozzi, a hearing specialist, because there also was a concern as to hearing impairment. In a letter dated April 22, 2004, Andreozzi concluded that the plaintiff's hearing overall was in the normal range, but was impaired in situations where there was a significant degree of background noise, a common problem for persons who had sustained head injuries. Andreozzi further concluded that this problem would not preclude the plaintiff from working. In a March 10, 2004 report, Novella concluded that, although the plaintiff's initial neurological examination was normal overall and nothing indicated that the plaintiff was incapable of returning to work, Novella would "be better able to assess [that] after [his] workup is complete." Novella ordered a magnetic resonance imaging (MRI) of the plaintiff's brain and an electroencephalogram (EEG), both of which were performed in April, 2004, and revealed no abnormalities. At some unspecified time, Novella recommended that the plaintiff undergo neuropsychological testing and referred the plaintiff to Kimberly Stoddard, a neuropsychologist affiliated with Yale University. The plaintiff was unable to get an

appointment with Stoddard until September 13, 2004.[16] In her undated report, Stoddard noted that the plaintiff's test results were in the normal range, although "[s]ome subtle executive impairments were noted on tasks of divided attention, inhibition, initiation, and processing speed. . . . The subtle difficulties in certain aspects of [his] executive functioning may be the residua of his [traumatic brain injury], but are not significant enough to cause marked problems in his adaptive functioning or work capacity. There is no compelling evidence to suggest that [the plaintiff] is unable to return to work at this time." The plaintiff returned to work on November 10, 2004.

During the period that he was out on family medical leave, the plaintiff worked twenty-five to thirty hours per week in his landscaping business that he operated on the side. He also engaged in recreational activities. The plaintiff did not claim, however, that he physically was unable to perform his job. Rather, he claimed that he had lost wages while out on family medical leave for two reasons connected to the accident: (1) he was required to be out of work to investigate cognitive problems that were caused by the accident; and (2) had he not used his paid sick leave to cover the wages that he otherwise would have lost during his five month recovery period from the accident, he would have had paid sick leave available to cover his wage loss during his family leave absence.[17] With these facts in mind, we turn to the defendant's claim that the misconduct evidence was admissible to impeach the plaintiff's claim that his 2004 lost wages were causally connected to the accident.

---

[16] Bertman testified that it usually takes several weeks to months to obtain appointments for neuropsychological testing.

[17] We address in part III of this opinion whether the plaintiff proved this causal connection.

It is a close question as to whether the trial court abused its discretion in precluding the October 10, 2003 letter notifying the plaintiff that he was being placed on a one year probation period. On the one hand, that evidence was relevant to a theory that the defendant sought to advance to dispute the plaintiff's claim for lost wages in 2004, namely, that the plaintiff's absence from work during the period he took family medical leave resulted from his desire to avoid further disciplinary action during his probation period, rather than accident related causes. Indeed, all but approximately one month of the plaintiff's probation period overlapped with his family leave period. On the other hand, it is questionable whether the jury would have credited the defendant's theory because it presupposes that the plaintiff would choose to lose many months of wages, without any certainty that he would recover those lost wages in his lawsuit, rather than simply adhere to the city's rules for the remainder of his probation period to avoid further discipline.

We need not decide, however, whether the trial court's decision to exclude this evidence was proper because it is clear that the exclusion was not harmful error. See *Desrosiers* v. *Henne,* supra, 283 Conn. 365–66 ("[B]efore a party is entitled to a new trial because of an erroneous evidentiary ruling, he or she has the burden of demonstrating that the error was harmful. . . . The harm[ful] error standard in a civil case is whether the improper ruling would likely affect the result." [Internal quotation marks omitted.]). Although this evidence could have been relevant to an issue at trial, it ultimately was not because the defendant adopted a strategy at trial that did not put into dispute the existence or terms of the agreement under which the plaintiff was required to take medical leave. The defendant proffered no evidence and adduced no testimony on cross-examination to call into question whether the

plaintiff was required, pursuant to an agreement with the city, to take medical leave for the purpose of undergoing neurological testing to clear him to return to work. In fact, on cross-examination by the defendant, the city's deputy fire chief, Cunningham, confirmed the essential facts of the agreement.[18] In its brief to this court, the defendant concedes the existence of that agreement, framing its claim as follows: "Because the plaintiff was out of work for most of 2004 under a separate agreement between the city and [the] plaintiff's union, he was able to avoid another violation of the [c]ode of [c]onduct during the probationary period which would have resulted in termination. The jury should have been able to learn about the plaintiff's probationary status in weighing whether his extended time out of work was, in fact, due *at least in part* to his desire to avoid termination for violation of the [c]ode of [c]onduct during the probationary period rather than due to any injuries." (Emphasis added.) If it is undisputed that the plaintiff was required, under the terms of the agreement with the city, to remain out of work until he underwent neurological testing that cleared him to return to work, however, it is immaterial whether the plaintiff also benefited from taking leave by avoiding circumstances in which he possibly could have received further discipline.

Moreover, despite the defendant's characterization of Novella's report as clearing the plaintiff to return to work, the only report that *unconditionally* cleared the plaintiff to return to work was Stoddard's report issued some time after their September 13, 2004 appointment,

---

[18] We also note that Cunningham's testimony and the plaintiff's medical evaluations support the basis for the medical leave, namely, that the accident had caused some impairment to the plaintiff's decision-making ability, both as to the promptness of making decisions and the appropriateness of the substance of those decisions, although that impairment ultimately was determined not to be so substantial as to preclude the plaintiff from performing his job.

and Bertman essentially testified to that fact. Novella's report stated that he could confirm the plaintiff's status only after conducting further tests. The defendant proffered no witnesses to testify regarding the terms of the agreement to establish that the city would have permitted the plaintiff to return to work at any date earlier than his actual return. Indeed, in its closing argument to the jury, the defendant did not argue that the plaintiff could have mitigated damages by obtaining earlier treatment or even address any aspect of damages. Accordingly, even if we were to assume that the trial court abused its discretion in precluding the defendant from using the misconduct evidence regarding the plaintiff's probation period, the defendant cannot demonstrate that this exclusion constituted harmful error.

## III

Finally, we briefly address the defendant's claims regarding the award of damages for the plaintiff's 2004 wage loss while he was out on family medical leave. The defendant claims that the trial court abused its discretion in allowing the jury to consider this claim in the absence of a foundation for the evidence proffered by the plaintiff—Cunningham's testimony regarding the leave period and a document calculating the lost wages for that period. The defendant also contends that there was insufficient evidence for the jury to award damages for the 2004 lost wages. The crux of both of these contentions is that there was no evidence that the plaintiff was incapable of working during this period, and, to the contrary, the plaintiff's own testimony and the reports of the physicians treating him during this leave period establish that he was capable of performing his job as a firefighter during this period. We disagree with the defendant's reasoning.

"[A party] who seeks to recover damages [on the ground of lost earnings or earning capacity] must establish a reasonable probability that his injury did bring about a loss of earnings, and must afford a basis for a reasonable estimate by the trier, court or jury, of the amount of that loss." (Internal quotation marks omitted.) *Mazzucco* v. *Krall Coal & Oil Co.*, 172 Conn. 355, 360, 374 A.2d 1047 (1977); *Daigle* v. *Metropolitan Property & Casualty Ins. Co.*, 60 Conn. App. 465, 469, 760 A.2d 117 (2000), aff'd, 257 Conn. 359, 777 A.2d 681 (2001); accord *Delott* v. *Roraback*, 179 Conn. 406, 411, 426 A.2d 791 (1980). "[I]n order to demonstrate that the defendant's conduct legally caused the decedent's injuries, the plaintiff must prove both causation in fact and proximate cause." *Winn* v. *Posades*, supra, 281 Conn. 59.

As we noted in part II D 2 of this opinion, the plaintiff never claimed that he was incapable of working while he was out on leave. Rather, he claimed that his wage loss was causally related to the accident because: (1) the cognitive and hearing problems caused by his accident had led to the agreement under which the plaintiff was required to undergo testing to ensure his capability of performing his job; and (2) he would have had sufficient paid sick leave to cover his wage loss during his medical leave had he not used it to cover his accident recovery period.[19] Testimony by the plaintiff and Cunningham was competent evidence that the plaintiff would have had sufficient paid sick leave to cover the 2004 lost wages but for the accident, and undisputed evidence established that cognitive problems caused by the accident were the impetus for the agreement that the plaintiff would take medical leave to undergo

---

[19] Because we conclude that the plaintiff established both of these predicates for his wage loss damages, we express no opinion as to whether the jury properly could have awarded damages if only one of these predicates had been established.

testing. Whether to credit this evidence was a matter for the jury. See *Delott* v. *Roraback*, supra, 179 Conn. 411–12 (within province of trier of fact to credit plaintiff's testimony concerning earning capacity); see also *Carrano* v. *Yale-New Haven Hospital*, 279 Conn. 622, 646–47, 904 A.2d 149 (2006) ("Ordinarily in civil cases the testimony of a single witness is sufficient to establish any fact, including the amount of damages, unless more proof is required by statute, even though the witness is a party or interested in the action. . . . Thus, if a plaintiff presents testimonial evidence with respect to damages, it is solely within the province of the jury to assess the credibility of the plaintiff and to weigh the value of his or her testimony." [Citation omitted; internal quotation marks omitted.]). The fact that the tests ultimately proved that the plaintiff was capable of performing his job despite some impairments resulting from the accident does not sever the causal connection between the accident and his wage loss.

The judgment is affirmed.

In this opinion the other justices concurred.