JESSICA REARDON *v.* WINDSWEPT
FARM, LLC, ET AL.
(SC 17506)

Borden, Norcott, Katz, Vertefeuille and Zarella, Js.

Argued May 16—officially released October 3, 2006

*Jeffrey I. Carton*, with whom, on the brief, was *Robert J. Levine*, for the appellant (plaintiff).

*John C. Turner, Jr.*, for the appellees (defendants).

*Opinion*

BORDEN, J. The dispositive issue in this appeal is whether a release signed by the plaintiff, Jessica Reardon, indemnifying the defendants, Windswept Farm, LLC, and its owners, William Raymond and Mona Raymond, from an action brought in negligence, precludes the plaintiff from recovering damages. More specifically, the question before this court is whether the release signed by the plaintiff violates public policy pursuant to our holding in *Hanks* v. *Powder Ridge Restaurant Corp.*, 276 Conn. 314, 885 A.2d 734 (2005). The plaintiff appeals[1] from the judgment of the trial court granting the defendants' motion for summary judgment. The plaintiff claims that: (1) the trial court incorrectly concluded that the release signed by the plaintiff was clear and unambiguous; and (2) in light of this court's holding in *Hanks*, the release violates public policy.[2]

---

[1] The plaintiff appealed from the judgment of the trial court to the Appellate Court. We then transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] Briefly stated, in *Hanks* this court dealt with an issue left unresolved by our holding in *Hyson* v. *White Water Mountain Resorts of Connecticut, Inc.*, 265 Conn. 636, 643, 829 A.2d 827 (2003), wherein we did not have the opportunity to pass upon the question of whether the enforcement of a well drafted agreement that purports to release a party from liability for its prospective negligence is contrary to public policy. In particular, in *Hanks* we concluded that an otherwise well drafted, clear and unambiguous exculpatory agreement, purporting to release a defendant from its prospective liability for ordinary negligence, nonetheless violated public policy and was therefore unenforceable. *Hanks* v. *Powder Ridge Restaurant Corp.*, supra, 276 Conn. 326. That decision was issued during the pendency of the present appeal, which led us to order supplemental briefing by the parties regarding

We conclude that our holding in *Hanks* controls the present case and, therefore, that the release signed by the plaintiff was invalid. Accordingly, we reverse the judgment of the trial court.

The plaintiff brought this personal injury action against the defendants alleging negligence. The defendants moved for summary judgment, arguing that the release signed by the plaintiff was clear and unambiguous, and thus satisfied the standard that this court set forth in *Hyson* v. *White Water Mountain Resorts of Connecticut, Inc.*, 265 Conn. 636, 643, 829 A.2d 827 (2003), which provided that "a party cannot be released from liability for injuries resulting from its future negligence in the absence of language that expressly so provides." The trial court agreed that the plaintiff had signed a well drafted waiver of liability in the defendants' favor, granted the defendants' motion for summary judgment, and rendered judgment thereon. This appeal followed.

The following facts are relevant to our analysis of the plaintiff's claims. The defendants are in the business of providing horseback riding lessons to the general public. In October, 2002, the plaintiff came to the defendants' property and requested a horseback riding lesson. As a condition to riding one of the defendants' horses, the plaintiff was required by the defendants to sign a release and indemnity agreement (release). The release was printed on a single page and consisted of

whether the trial court's judgment should be summarily reversed in light of our decision in *Hanks*.

three sections entitled, "Warning,"[3] "RELEASE,"[4] and "INDEMNITY AGREEMENT."[5] It is undisputed that the plaintiff signed and dated the release prior to commencing her horseback riding lesson with the defendants. Similarly, it is undisputed that the plaintiff identified herself on the release as an "[e]xperienced [r]ider" and as someone who had "[r]idden [horses] frequently" several years earlier.

Subsequent to the plaintiff signing the release provided by the defendants, the defendants paired the plaintiff with one of the horses from their stables and with one of the instructors in their employ. During the course of the plaintiff's horseback riding lesson, the horse provided by the defendants became excited, bucked back and forth suddenly and without warning, and threw the plaintiff to the ground, causing her serious injuries.

---

[3] The "Warning" portion of the release provided as follows: "Pursuant to Connecticut General Statutes § 52-577p, [now § 52-557p] a person engaged in recreational activities assumes the risk and responsibility for any injury to his person or property arising out of the hazards inherent in equestrian sports, unless the injury was proximately caused by the negligence of the person providing the horse or horses to the individual engaged in the equestrian activities or the failure to guard or warn against a dangerous condition, use, structure or activity by the person provided the horse or horses or his agents or employees."

[4] The "RELEASE" portion of the release provided in relevant part: "For, and in consideration of, the privilege to participate in an equine activity at Windswept Farm this date, receipt and sufficiency of which is hereby acknowledged, the undersigned hereby agrees to release, discharge and acquit WINDSWEPT FARM, its owners, stockholders, officers, directors, employees, agents, and servants from any and all claims, demands, sums of money, actions, rights, causes of action, liabilities and obligations of any kind or nature whatsoever, *including ordinary negligence*, which I may have had or now have or claim to have had, or hereafter may have, or assert to have, which arise out of, or is in any manner whatsoever directly or indirectly, connected with or related to my participation in the equine activity on this date. . . ." (Emphasis added.)

[5] The "INDEMNITY AGREEMENT" portion of the release provided in relevant part: "The undersigned represents and warrants that he/she has read and understood the above-captioned Warning and Release. . . ."

The plaintiff brought an action in August, 2003, alleging that she had been injured due to the defendants' negligence. In particular, the plaintiff alleged that her injuries were caused by the "carelessness, recklessness and negligence of the defendants" including, among other things, that (1) the "defendants failed to ensure that the horse on which [she] was placed was an appropriate horse commensurate with [the plaintiff's] skill and experience"; (2) the "defendants failed to prevent, warn or protect the plaintiff from the risk of a fall"; (3) the "defendants knew of the horse's propensity to buck yet failed to warn [the plaintiff] of the same"; and (4) the "defendants failed properly to hire and train their riding instructor . . . ." In their answer, the defendants raised a special defense, namely, that "[t]he plaintiff [had] assumed the risk and legal responsibility for any injury to her person per . . . General Statutes [§] 52-557p,"[6] and that "[t]he plaintiff's claims [were] barred [due to the fact] that she signed a waiver/release of all claims in favor of the defendants."

The plaintiff makes two claims on appeal. First, the plaintiff claims that the release of all claims "includ[ing] 'ordinary negligence'" set forth in the release was ambiguous when read together with the "Warning" section printed above it, which, tracking § 52-557p, did not exempt from liability injuries "proximately caused by the negligence of the person providing the horse or horses to the individual engaged in the equestrian activities . . . ." Second, pursuant to our order for supple-

---

[6] The "Warning" section of the release mirrors General Statutes § 52-557p, which provides: "Each person engaged in recreational equestrian activities shall assume the risk and legal responsibility for any injury to his person or property arising out of the hazards inherent in equestrian sports, unless the injury was proximately caused by the negligence of the person providing the horse or horses to the individual engaged in recreational equestrian activities or the failure to guard or warn against a dangerous condition, use, structure or activity by the person providing the horse or horses or his agents or employees."

mental briefing, the plaintiff claims that the release is void as a matter of public policy in light of this court's decision in *Hanks* v. *Powder Ridge Restaurant Corp.*, supra, 276 Conn. 314. We agree with the plaintiff that our decision in *Hanks* controls the present case. Accordingly, we need not consider the plaintiff's claim that the trial court incorrectly concluded that the release signed by the plaintiff was clear and unambiguous.[7]

We begin with the appropriate standard of review. "Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party moving for summary judgment has the burden of showing the absence of any genuine issue of material fact and that the party is, therefore, entitled to judgment as a matter of law. . . . The test is whether the party moving for summary judgment would be entitled to a directed verdict on the same facts. . . . Our review of the trial court's decision to grant the defendant's motion for summary judgment is plenary." (Citations omitted; internal quotation marks omitted.) *Leisure Resort Technology, Inc.* v. *Trading Cove Associates*, 277 Conn. 21, 30–31, 889 A.2d 785 (2006).

In light of our holding in *Hanks*, we cannot conclude that the defendants are entitled to a judgment in their

---

[7] Specifically, assuming that the standards identified in *Hanks* have been satisfied, as we conclude in the present case, it is irrelevant whether the underlying release of liability was clearly and unambiguously drafted and, therefore, was also invalid pursuant to our holding in *Hyson* v. *White Water Mountain Resorts of Connecticut, Inc.*, supra, 265 Conn. 643, which provided that "a party cannot be released from liability for injuries resulting from its future negligence in the absence of language that expressly so provides."

favor as a matter of law. Put another way, our reasoning in *Hanks* requires that we invalidate the release signed by the plaintiff; thus, several genuine issues of material fact surrounding the defendants' potential negligence remain in dispute.

As previously noted, in *Hanks*, we concluded that the enforcement of a well drafted exculpatory agreement that releases a provider of a recreational activity from prospective liability for personal injuries sustained as a result of the provider's negligence may violate public policy if certain conditions are met. *Hanks* v. *Powder Ridge Restaurant Corp.*, supra, 276 Conn. 326. In general, we noted that "[t]he law does not favor contract provisions which relieve a person from his own negligence . . . . This is because exculpatory provisions undermine the policy considerations governing our tort system . . . [which include] compensation of innocent parties, shifting the loss to responsible parties or distributing it among appropriate entities, and deterrence of wrongful conduct . . . ." (Citation omitted; internal quotation marks omitted.) Id., 327. Moreover, we recognized that "it is consistent with public policy to posit the risk of negligence upon the actor and, if this policy is to be abandoned, it has generally been to allow or require that the risk shift to another party better or equally able to bear it, not to shift the risk to the weak bargainer." (Internal quotation marks omitted.) Id.

Additionally, when assessing the public policy implications of a particular release or waiver of liability, we concluded that "[n]o definition of the concept of public interest [may] be contained within the four corners of a formula," and that "[t]he ultimate determination of what constitutes the public interest must be made considering the totality of the circumstances of any given case against the backdrop of current societal expectations." (Internal quotation marks omitted.) Id., 330. Our

analysis in *Hanks* was also guided, though not limited, by the factors articulated by the Supreme Court of California in *Tunkl* v. *Regents of the University of California*, 60 Cal. 2d 92, 98–101, 383 P.2d 441, 32 Cal. Rptr. 33 (1963),[8] which include, among other things, a consideration as to whether the release pertains to a business thought suitable for public regulation, whether the party performing the service holds himself out as making the activity available to any member of the public who seeks it, and whether the provider of the activity exercises superior bargaining power and confronts the public with a standard contract of adhesion.

In the context of snowtubing, which was the recreational activity at issue in *Hanks*, we placed particular emphasis on: (1) the societal expectation that family oriented activities will be reasonably safe; (2) the illogic of relieving the party with greater expertise and information concerning the dangers associated with the activity from the burden of proper maintenance of the snowtubing run; and (3) the fact that the release at issue was a standardized adhesion contract, lacking equal bargaining power between the parties, and

[8] The complete list of factors identified by the Supreme Court of California are as follows: "[1] [The agreement] concerns a business of a type generally thought suitable for public regulation. [2] The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. [3] The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. [4] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. [5] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. [6] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents." *Tunkl* v. *Regents of the University of California*, supra, 60 Cal. 2d 98–101.

offered to the plaintiff on a " 'take it or leave it' " basis. *Hanks* v. *Powder Ridge Restaurant Corp.*, supra, 276 Conn. 331–34. Moreover, we recognized the clear public policy in favor of participation in athletics and recreational activities. Id., 335 ("[v]oluntary recreational activities, such as snowtubing, skiing, basketball, soccer, football, racquetball, karate, ice skating, swimming, volleyball or yoga, are pursued by the vast majority of the population and constitute an important and healthy part of everyday life").

We conclude that, based on our decision in *Hanks*, the totality of the circumstances surrounding the recreational activity of horseback riding and instruction that was offered by the defendants demonstrates that the enforcement of an exculpatory agreement in their favor from liability for ordinary negligence violates public policy and is not in the public interest. First, similar to the situation at issue in *Hanks*, the defendants in the present case provided the facilities, the instructors, and the equipment for their patrons to engage in a popular recreational activity, and the recreational facilities were open to the general public regardless of an individual's ability level. Indeed, the defendants acknowledged that, although the release required riders to indicate their experience level, it also anticipated a range in skills from between "[n]ever ridden" to "[e]xperienced [r]ider," and that the facility routinely had patrons of varying ability levels. Accordingly, there is a reasonable societal expectation that a recreational activity that is under the control of the provider and is open to all individuals, regardless of experience or ability level, will be reasonably safe.

Additionally, in the present case, as in *Hanks*, the plaintiff "lacked the knowledge, experience and authority to discern whether, much less ensure that, the defendants' [facilities or equipment] were maintained in a reasonably safe condition." *Hanks* v. *Powder Ridge Res-*

*taurant Corp.*, supra, 276 Conn. 331. Specifically, although the plaintiff characterized herself as an experienced rider, she was in no greater position then the average rider[9] to assess all the safety issues connected with the defendants' enterprise. To the contrary, it was the defendants, not the plaintiff or the other customers, who had the "expertise and opportunity to foresee and control hazards, and to guard against the negligence of their agents and employees. They alone [could] properly maintain and inspect their premises, and train their employees in risk management." (Internal quotation marks omitted.) Id., 331–32. In particular, the defendants acknowledged that they were responsible for providing their patrons with safe horses, qualified instructors, as well as properly maintained working equipment and riding surfaces. In the context of carrying out these duties, the defendants were aware, and were in a position continually to gather more information, regarding any hidden dangers associated with the recreational activity including the temperaments of the individual horses, the strengths of the various riding instructors, and the condition of the facility's equipment and grounds. As we concluded in *Hanks*, it is illogical to relieve the defendants, as the party with greater expertise and information concerning the dangers associated with engaging in horseback riding at their facility, from potential claims of negligence surrounding an alleged failure to administer properly the activity.

Furthermore, the release that the plaintiff signed broadly indemnifying the defendants from liability for damages resulting from the defendants' own negligence was a classic contract of adhesion of the type that this court found to be in violation of public policy in *Hanks*. Specifically, we have noted that "[t]he most salient fea-

---

[9] We also note that we view the release as it applies to all customers, not solely this plaintiff, who happened to have significant riding experience, albeit several years prior to the date of her accident.

ture [of adhesion contracts] is that they are not subject to the normal bargaining processes of ordinary contracts," and that they tend to involve a "standard form contract prepared by one party, to be signed by the party in a weaker position, [usually] a consumer, who has little choice about the terms . . . ." (Internal quotation marks omitted.) Id., 333. In the present case, signing the release provided by the defendants was required as a condition of the plaintiff's participation in the horseback riding lesson, there was no opportunity for negotiation by the plaintiff, and if she was unsatisfied with the terms of the release, her only option was to not participate in the activity. As in *Hanks*, therefore, the plaintiff had nearly zero bargaining power with respect to the negotiation of the release and in order to participate in the activity, she was required to assume the risk of the defendants' negligence. This condition of participation violates the stated public policy of our tort system because the plaintiff was required to bear an additional risk despite her status as a patron who was not in a position to foresee or control the alleged negligent conduct that she was confronted with, or manage and spread the risk more effectively then the defendants.

We are also mindful that, as evidenced by § 52-557p, recreational horseback riding is a business thought suitable for public regulation, but that the legislature has stopped short of requiring participants to bear the very risk that the defendants now seek to pass on to the plaintiff by way of a mandatory release. In particular, the legislature has prescribed that "[e]ach person engaged in recreational equestrian activities shall assume the risk and legal responsibility for any injury to his person or property *arising out of the hazards inherent in equestrian sports, unless the injury was proximately caused by the negligence of the person providing the horse or horses to the individual* . . . ."

(Emphasis added.) General Statutes § 52-557p; see footnote 6 of this opinion. This language establishes that the plaintiff assumed the risk for certain injuries when riding at the defendants' facility due to the nature of horseback riding as an activity, but that an operator of such a facility can still be liable for injuries caused by its own negligence. For the reasons previously discussed, we conclude that the defendants' attempt contractually to extend the plaintiff's assumption of risk one step beyond that identified by the legislature in § 52-557p violates the public policy of the state and, therefore, is invalid.

The defendants contend that the plaintiff's only claim before the trial court was that the release was ambiguous, and that the plaintiff otherwise conceded the release's enforceability, thereby failing to preserve for appeal the issue of whether the release violated public policy.[10] Put another way, the defendants contend that the issue before the trial court was only whether the addition of the "warning" language to the release as a whole resulted in contradictory language, and that regardless of our decision in *Hanks*, we still must decide the issue articulated by the trial court. We disagree.

We recognize that this court is not "bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial." Practice Book § 60-5; see also *Pestey* v. *Cushman*, 259 Conn. 345, 372–74, 788 A.2d 496 (2002). Additionally, as a general rule, "[a]

---

[10] As part of the defendants' motion for summary judgment, and in an effort to clarify the plaintiff's case, the trial court asked the plaintiff directly if the release were found to be clear and unambiguous, would it be enforceable:

"The Court: You are not trying to claim that it's not possible under Connecticut law for a person in the defendants' position to present an effective release to a horse rider and then to rely upon it to avoid liability, are you?

"[The Plaintiff's Counsel]: Absolutely not, Your Honor. . . .

"The Court: Okay. Then . . . so that what we have to do is to determine whether this is a sufficient release. *That's the only issue before us.*

"[The Plaintiff's Counsel]: Absolutely, Your Honor." (Emphasis added.)

party cannot present a case to the trial court on one theory and then ask a reversal in the [S]upreme [C]ourt on another." (Internal quotation marks omitted.) *Sorrentino* v. *All Seasons Services, Inc.*, 245 Conn. 756, 770, 717 A.2d 150 (1998). This court, however, has the discretion to act, sua sponte, on grounds not directly raised by the parties. See *Burton* v. *Browd*, 258 Conn. 566, 569, 783 A.2d 457 (2001). That is exactly what we did in the present case when, in light of our decision in *Hanks*, we ordered the parties to brief the issue of whether the release was void as a matter of public policy.[11] In sum, because *Hanks* resolved an issue previously unaddressed, and because the parties had the opportunity to brief the case's impact, we conclude that the interest in the uniform application of the plainly governing law warrants our consideration of a claim beyond the narrow issue that was before the trial court.

Finally, the defendants contend that horseback riding is somehow different from snowtubing and, therefore, that the defendants' release does not violate public policy. In particular, the defendants note that horseback riding is not one of the recreational activities that we specifically identified by name in *Hanks* v. *Powder Ridge Restaurant Corp.*, supra, 276 Conn. 335, and that, unlike in *Hanks*, which involved an injury caused by a defective snowtube run, in the present case the plaintiff was injured when the horse she was riding bucked and threw her to the ground. The defendants claim that this distinction is significant because they characterize a bucking horse as a risk that is inherent to horseback riding in general. We are not persuaded.

The list of recreational activities that we identified in *Hanks* was meant to be illustrative, not exhaustive. See id. Indeed, it would be impossible for us to identify all of the recreational activities controlled by the *Hanks*

---

[11] See footnote 2 of this opinion.

decision.[12] Additionally, as previously discussed in detail, the circumstances surrounding the defendants' horseback riding business and the signing of the release by the plaintiff bear many similarities to the circumstances present in *Hanks*. In particular, the defendants' horseback riding business was open to the general public regardless of skill level, the plaintiff was ill equipped to discern whether she had been paired negligently with her horse and instructor commensurate with her skill level, the defendants controlled which horse and instructor were assigned to the plaintiff, and the defendants' release constituted a classic contract of adhesion.

Furthermore, the fact that there are certain risks that are inherent to horseback riding as a recreational activity, as the legislature recognized in § 52-557p, one of which may be that horses move unexpectedly, does not change the fact that an operator's negligence may contribute greatly to that risk. For example, the defendants' may have negligently paired the plaintiff with an inappropriate horse given the length of time since she last had ridden or negligently paired the plaintiff with an instructor who had not properly been trained on how to handle the horse in question. Both of these scenarios present factual questions that, at trial, may reveal that the defendants' negligence, and not an inherent risk of the activity, was to blame for the plaintiff's injuries.

---

[12] We are mindful that contrary to the defendants' argument, our courts repeatedly have referenced horseback riding as a recreational activity. See *Conway* v. *Wilton*, 238 Conn. 653, 668, 680 A.2d 242 (1996) (state legislator commenting on necessity of "maintaining land that could very well serve for . . . horseback riding and for many other recreational activities"); *Miskimen* v. *Biber*, 85 Conn. App. 615, 620, 858 A.2d 806 (2004) ("[t]he excess land is also used for . . . horseback riding and other recreational activities"), cert. denied, 272 Conn. 916, 866 A.2d 1287 (2005). Moreover, our characterization of snowtubing as a recreational activity; see *Hanks* v. *Powder Ridge Restaurant Corp.*, supra, 276 Conn. 330; does not, in and of itself, dictate our public policy.

Moreover, as aptly noted at oral argument before this court, the plaintiff does not challenge the fact that there were risks inherent in the activity of horseback riding that she otherwise was prepared to assume. Rather, she challenges the defendants' claimed indemnity from the alleged neglect and carelessness of the stable operator and its employees to whom she entrusted her safety. Indeed, the inherent unpredictability of a horse is something that the legislature already has considered in providing to an operator of a horseback riding facility a defense to a claim of negligence pursuant to the assumption of risk doctrine codified in § 52-557p. This protection granted by the legislature, however, does not permit the operator to avoid liability entirely for its negligence or that of its employees. Accordingly, on the basis of our decision in *Hanks*, as well as the circumstances of the present case, we are unable to conclude that the recreational activity of horseback riding is so different from snowtubing that the release in this case should be enforced as a matter of law.

The judgment is reversed and the case is remanded to the trial court with direction to deny the defendants' motion for summary judgment, and for further proceedings according to law.

In this opinion KATZ, VERTEFEUILLE and ZARELLA, Js., concurred.

NORCOTT, J., concurring. I agree with the majority that this court's holding in *Hanks* v. *Powder Ridge Restaurant Corp.*, 276 Conn. 314, 885 A.2d 734 (2005), controls the present case.