******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STEFANA PECHER ET AL. *v.* RHEA
DISTEFANO ET AL.
(AC 38287)

Prescott, Mullins and Bear, Js.

*Syllabus*

The plaintiff P sought to recover damages for personal injuries she sustained
while taking horseback riding lessons at a horse stable owned and
operated by the defendant D, claiming that her injuries were caused
by, inter alia, D's negligence in failing to warn her concerning certain
dangerous conditions at the stable and the inherent risks of horseback
riding. Following a trial, the jury returned a verdict in favor of D. There-
after, the trial court rendered judgment in accordance with the verdict,
and P appealed to this court. She claimed that the trial court committed
harmful error by admitting into evidence a written agreement between
the parties and a photograph of a sign on the stable's premises, both
of which purported to release D from all liability for injuries arising
out of horse related activities at the stable. *Held* that the record was
inadequate to review P's claim that the trial court committed harmful
error by admitting into evidence the subject agreement and photograph;
P failed to provide this court with various transcripts of the trial proceed-
ings, and without a complete record of the trial, this court could not
make an informed assessment of P's claim of harmful error pursuant
to the relevant factors for evaluating a claim of evidentiary impropriety,
including an evaluation of the relationship of the agreement and the
photograph to the issue of D's alleged negligence, whether the trial court
gave any additional curative instructions to the jury that mitigated the
effect of the challenged evidentiary ruling, whether the subject evidence
was cumulative of other validly admitted evidence, and whether the
trial court's allegedly improper ruling affected the jury's perception of
the remaining evidence.

Argued January 31—officially released September 26, 2017

*Procedural History*

Action to recover damages for, inter alia, the defen-
dants' alleged negligence, and for other relief, brought
to the Superior Court in the judicial district of New
London, where the complaint was withdrawn in part;
thereafter, the court, *Cole-Chu, J.*, denied the named
plaintiff's motion to preclude certain evidence; subse-
quently, the matter was tried to the jury; verdict for
the named defendant; thereafter, the court denied the
named plaintiff's motion to set aside the verdict and
for a new trial, and rendered judgment in accordance
with the verdict, from which the named plaintiff
appealed to this court. *Affirmed.*

*James J. Healy*, with whom was *Christopher P.
Anderson*, for the appellant (named plaintiff).

*Greg S. Kreiger*, with whom was *John Stephen Papa*,
for the appellee (named defendant).

*Opinion*

MULLINS, J. The plaintiff, Stefana Pecher,[1] appeals from the judgment of the trial court, following a jury trial, rendered in favor of the defendant, Rhea Distefano.[2] On appeal, the plaintiff claims that the trial court committed harmful error, requiring a new trial, by admitting a document, titled "Release and Hold Harmless Agreement," and a photograph of a sign (photo), both of which, at least in part, purported to relieve the defendant from all liability for injuries arising out of horse related activities at Showtime Stables. The issue in this appeal is whether we can review the plaintiff's claims notwithstanding the fact that she has failed to provide us with a complete record. We conclude that the absence of a complete record restricts our ability to review fully and accurately the plaintiff's claims of harmful error. Accordingly, we affirm the judgment of the trial court.

On the basis of the incomplete record provided to us on appeal, we conclude that the jury reasonably could have found the following facts in reaching its verdict in favor of the defendant. The defendant operates a horse stable, known as Showtime Stables. As part of her business, she gives riding lessons to patrons. The defendant requires riders to sign a "Release and Hold Harmless Agreement" (document) that provides:

"The Undersigned assumes the unavoidable risks inherent in all horse-related activities, including but not limited to bodily injury and physical harm to horse, rider, and spectator.

"In consideration, therefore, for the privilege or riding and/or working around horses at _____, located at _____, the Undersigned does hereby agree to hold harmless and indemnify _____ and further release them from any liability or responsibility for accident, damage, injury, or illness to the Undersigned or to any horse owned by the Undersigned or to any family member or spectator accompanying the Undersigned on the premises."

The plaintiff had taken a few riding lessons as a child and, more recently, had taken approximately twenty additional lessons as an adult at another stable. She then began taking riding lessons from the defendant. On January 23, 2010, the plaintiff, her friend, Audrey Ulmer, and their two daughters went to the defendant's stable for riding lessons. The plaintiff rode a horse named Pepsi during her riding lesson. Most, if not all, of the plaintiff's six lessons with the defendant had been on Pepsi. Pepsi had a tendency to be rather "lazy," and, in an effort to get Pepsi to cooperate, the rider needed to use his or her leg strength to squeeze the horse or, in the alternative, a crop. Pepsi is "the couch potato of horses. . . . Her demeanor is very, very quiet. She doesn't get flustered easily. . . . [S]he's safe, she's

quiet, she's reliable." The defendant had never seen Pepsi bolt or do anything like that.

During the plaintiff's lesson on January 23, 2010, she fell off Pepsi, sustaining personal injuries. When an injury occurred to a rider, the defendant made and kept a record of that event. That evening, after the plaintiff had been injured, the defendant recorded the incident in relevant part as follows: "[The plaintiff] was riding Pepsi in first lesson of new package today when Pepsi became very lazy. I instructed [the plaintiff] to tap [Pepsi] on [the] shoulder with her crop and Pepsi still wouldn't get going. I swapped out [the] short crop with [a] larger one for her to tap behind [Pepsi's] leg . . . on [the] flank area, and Pepsi trotted forward. When Pepsi went forward she did so quickly at [a] trot, and [the plaintiff] got bounced forward. She posted for a few steps and lost her balance and fell forward on Pepsi's neck with her legs gripping behind her saddle on the flank area. She fell forward onto Pepsi's neck and was holding [the] neck in [a] bear hug position, kicking with her legs. This went on for about [five] steps then Pepsi broke into [a] canter. I was yelling this whole time for her to sit up, stop kicking, sit back, pull on your reins. It was clear she was panicked, so I ran to [the] corner where [the] horse was and grabbed her outside rein and slowed her back to [a] trot as she went by me. Pepsi slowed to [a] trot and went toward [the] center of [the riding] ring and stopped. [The plaintiff] fell when [the] horse stopped, from [a] 'hug' position. [She] [r]olled onto her left hip [and] shoulder, onto [the] dirt footing. She laid for a minute and sat up and leaned against [a] block. I was next to her holding [the] horse and asked if she wanted [to call] 911. She said no. She never lost consciousness, was lucid, and could move all parts. . . . I said can [you] get back on and finish or is [your] knee [too] sore. She tried to rise and said [her] knee was too sore.* There didn't appear to be any swelling or obvious deviation. She said she had a friend who was [an] orthopedic [doctor] and that she would have [Ulmer] drive her there to have it looked at. [Ulmer] drove her car up . . . and picked her up. We helped her into [the] car. She was limping on [the] knee but [was able to put] some weight on it."

In addition to the asterisk placed in the middle of her record of this event, the defendant also placed another asterisk near the end of the record, seemingly to insert more information where the previous asterisk was placed, stating the following: "*At this point she was sitting on [a] plastic block. I went down to [the] barn with [the] horse [and] gave [the horse to the] kids to untack and went back to give her ice for [her] knee." As a result of her injuries, the plaintiff underwent surgery to repair her knee. She then commenced this action.

On January 13, 2015, the plaintiff filed a motion in

limine requesting that the court preclude the defendant from offering any evidence as to the document. The next day, the court conducted a hearing on the motion. During the hearing, the plaintiff argued that the document was void as a matter of public policy under *Reardon* v. *Windswept Farm, LLC*, 280 Conn. 153, 905 A.2d 1156 (2006), and that any probative value of the document was outweighed by its prejudicial effect. The plaintiff also argued that the document was cumulative in light of General Statutes § 52-557p, which provides: "Each person engaged in recreational equestrian activities shall assume the risk and legal responsibility for any injury to his person or property arising out of the hazards inherent in equestrian sports, unless the injury was proximately caused by the negligence of the person providing the horse or horses to the individual engaged in recreational equestrian activities or the failure to guard or warn against a dangerous condition, use, structure or activity by the person providing the horse or horses or his agents or employees."

At the conclusion of the argument on the motion in limine to preclude the document, the court denied the plaintiff's motion but left the issue open to be revisited if necessary: "So, I am denying the motion in limine, which was essentially to keep out the document, and to bar the defendant from making any reference to it. *How it unfolds in the actual course of things is to be seen, but I am not going to rule now against the offer of the release*." (Emphasis added.)

Later that day, during the cross-examination of Ulmer, the defendant's attorney asked her about her signing the document. Ulmer stated that she had signed it, and then the defendant's counsel offered the document into evidence at that time. The plaintiff's attorney stated that he had *no objection*: "If it's being offered as a document signed by . . . Ulmer, *I don't have an objection to that*." (Emphasis added.) The court stated that *it had* some trepidation about the relevance of the document, but "*if there's no objection*, it may be admitted to show what the witness identified herself [as signing]." (Emphasis added.)

The court then gave the jury a limiting instruction: "You're about to see, ladies and gentlemen of the jury, a document. It's entitled, 'Release and Hold Harmless Agreement.' Mrs. Ulmer has testified that she signed it, and that's the sole—the content of this as signed by Mrs. Ulmer is all you're presently allowed to consider it for. I would also note that—well, I'll say more about it if the occasion arises, but that's all you're allowed to consider it for right now." The document then was published to the jury.

Following its publication to the jury, the plaintiff's attorney stated: "Your Honor, at this time, I'd just like to state something for the record. I'd like to restate my objection to this line of inquiry [on] this issue, which

we have discussed on the record earlier this morning, and, once again, state that my basis is that the prejudicial effect of this, at this time, outweighs any probative value to the document, and that's exactly how it's unfolding at the present time. I just, for the record, I wanted to state my objection to the relevancy of this document and its admissibility in these circumstances."

The court immediately responded: "I said something about relevance earlier, and that was not the ground of objection. Your point is noted, sir . . . ."

Then, during the defendant's testimony on January 21, 2015, her attorney asked her about the document. The defendant stated that she had given the document to Ulmer and the plaintiff to sign, that she saw them sign it, and that they gave it back to her. That testimony was offered *without objection*, and without a further limiting instruction, as one was not requested at that time.

The defendant's attorney also showed the defendant the photo and asked her if she recognized it. The defendant stated that it was the photo of a sign that she has posted "by the doorway as you walk into the barn, right at eye level." The defendant's attorney then asked that the photo be entered as a full exhibit. The plaintiff's attorney stated that he objected on the ground of relevance, to which the defendant's attorney responded: "The purpose, Your Honor, is to demonstrate that the plaintiff knew about the inherent risks of riding at the stable, and it was there for her to see. Also, the plaintiff testified she never saw it, but this is testimony that it was present." No further objection was set forth, and the court admitted the photo. It also gave no limiting instruction, and the plaintiff did not request such an instruction at that time.

The plaintiff's attorney also questioned the defendant about the document, asking if she was required by law to have her students sign such documents. The defendant responded that she did not think there was such a requirement.

The defendant's attorney followed up by asking the defendant to recall the questioning of the plaintiff's attorney regarding the document, and then asked the defendant why she had her students sign such documents. The defendant responded: "Because horses as a sport in general are dangerous. There's risks associated with riding them, handling them, being around them. You could get hurt, you could get killed, you could get— a lot of things could happen. There are so many different scenarios, so to afford myself some protection, I try to use that."

Following that testimony, the defendant's attorney offered the document into evidence "for the purpose of showing that [the plaintiff] was warned about the inherent risks involved with riding." The court asked

if the plaintiff had an objection, and counsel responded: "With the understanding of what we talked about in chambers and your prior warnings, Your Honor."

The court admitted the document and offered the following admonishment: "Now, ladies and gentlemen of the jury, you've already seen defendant's exhibit A, because it came [into evidence] with Mrs. Ulmer. Now, it's a full exhibit. I'm instructing you that the law does not allow somebody to waive claims for somebody else's negligence in advance. You know, you can do it, technically, afterwards, but you—if you go into a restaurant, you can't be required to sign a release that, if I get food poisoning because the food's been out for three days, you know, the customer can't sue the restaurant. This exhibit is only being accepted by the court and may only be used by you as basically notice of the hazard. It is not a release of liability. It is not claimed to be a release of liability by the defense." The court then asked the plaintiff's attorney if it left "anything out." The plaintiff's attorney replied: "I think that was perfect, Your Honor," and the defendant's attorney replied: "I think that's what we discussed in chambers, Your Honor."

During the court's final charge to the jury, the court explained to the jury that it had a duty to listen carefully to the court's instructions and to follow them. It then instructed the jury on the law of negligence, including the duty to invitees and defective premises, and properly set forth the relevant allegations of the plaintiff's complaint and applied those allegations to its instruction on the law. It also instructed the jury on causation, damages and the burden of proof, and on the defendant's special defenses of contributory negligence and assumption of the risk pursuant to § 52-557p.

When the court gave its limiting instruction on the proper use of the document, the court admonished the jury in relevant part: "As I instructed you when that document . . . was admitted in evidence, that document is not, and is not claimed by the defendant to be, a release or hold-harmless agreement as to a claim of negligence of the defendant. As to the defendant—as the defendant acknowledges, any agreement that purport[s] to release the operator and/or owner of a horse riding facility from his or her negligent conduct would violate public policy and, therefore, be unenforceable. The only significance of that exhibit you could properly find if you see fit is that the parties . . . were aware of the general risks and hazards of horseback riding. In particular, if you find that the defendant was negligent in any of the ways alleged by the plaintiff and that that negligence caused the plaintiff's injuries or any of those injuries, the fact that the plaintiff signed that document must have no effect on your decision regarding what fair, just, and reasonable damages to award to the plaintiff."

The jury returned a verdict in favor of the defendant. Thereafter, the court denied the plaintiff's motion to set aside the verdict and for a new trial, and rendered judgment in accordance with the verdict. This appeal followed.

Our analysis of this appeal begins and ends with our consideration of the adequacy of the record provided by the plaintiff. We have examined the record provided by the plaintiff and conclude that she has failed to provide a complete and adequate record that would enable our review of her claims on appeal. The furnishing of a complete record is particularly important to a reviewing court that is called upon to consider the extent of the harm, if any, to an appellant who is requesting that the court reverse the judgment of the trial court on the basis of an alleged improper evidentiary ruling. See *Desrosiers* v. *Henne*, 283 Conn. 361, 367–69, 926 A.2d 1024, (2007) (declining to review evidentiary claim where defendant provided only excerpts of trial transcripts because it was impossible for reviewing court to determine whether alleged impropriety was harmful); *Ryan Transportation, Inc.* v. *M & G Associates*, 266 Conn. 520, 531, 832 A.2d 1180 (2003) (declining to review evidentiary claim where plaintiff did not provide transcript of testimony of witnesses, stating, "even if we assume, arguendo, that the challenged evidentiary ruling was improper, we have no way of discerning whether any such impropriety was harmful in the broader context of the entire trial"); *Chester* v. *Manis*, 150 Conn. App. 57, 62–63, 89 A.3d 1034 (2014) (declining to review evidentiary claim because incomplete record left court unable to determine if "alleged impropriety would likely have affected the result of the trial"); *Quaranta* v. *King*, 133 Conn. App. 565, 569–70, 36 A.3d 264 (2012) (declining to review plaintiff's evidentiary claim where plaintiff provided only partial transcript of proceedings).

A review of our appellate record in this case reveals that the plaintiff ordered and delivered a paper copy and an electronic copy of the following seven transcripts: (1) the January 14, 2015 argument on the motion in limine; (2) the January 14, 2015 cross-examination of lay witness Ulmer; (3) the January 15, 2015 cross-examination of the plaintiff; (4) the January 16, 2015 direct examination of the defendant; (5) the January 21, 2015 continued direct examination and the cross-examination of the defendant; (6) the direct examination of lay witness Sundy Martin; and (7) the January 22, 2015 jury charge. We also have been provided an electronic copy of the trial court's preliminary instructions to the jury, the January 21, 2015 cross-examination of Martin, and the May 11, 2015 argument on the plaintiff's postverdict motion to set aside the verdict and for a new trial. The plaintiff further has provided, in her appendix, a paper copy of her counsel's argument on

the plaintiff's motion to set aside the verdict and for a new trial.

We know for certain that we have not been provided the direct examination of Ulmer, the direct examination of the plaintiff, and the closing arguments of counsel. Additionally, we are left to speculate about precisely how many other witnesses may have testified and the content of their testimony,[3] exactly what the plaintiff said during her direct testimony, what counsel may have argued during any other part of the trial and during closing, and whether the court gave additional instructions or guidance to the jury during other parts of the trial that could be relevant to our analysis.

Here, as the appellant, it was the plaintiff's burden to provide a complete record on appeal. See Practice Book § 61-10. She also is responsible for establishing that she was harmed by the alleged improper evidentiary rulings of the trial court. See *Connecticut Light & Power Co.* v. *Gilmore*, 289 Conn. 88, 128, 956 A.2d 1145 (2008) ("Even when a trial court's evidentiary ruling is deemed to be improper, we must determine whether that ruling was so harmful as to require a new trial. . . . In other words, an evidentiary ruling will result in a new trial only if the ruling was both wrong and harmful." [Internal quotation marks omitted.]). This, the plaintiff cannot do in light of the incomplete record that she has provided this court.[4]

"[Our Supreme Court has] held generally that [t]he trial court has broad discretion in ruling on the admissibility [and relevancy] of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . Additionally, before a party is entitled to a new trial because of an erroneous evidentiary ruling, he or she has the burden of demonstrating that the error was harmful." (Citation omitted; internal quotation marks omitted.) *Urich* v. *Fish*, 261 Conn. 575, 580–81, 804 A.2d 795 (2002).

"A determination of harm requires us to evaluate the effect of the evidentiary impropriety in the context of the *totality of the evidence* adduced at trial. . . . Thus, our analysis [would include] a review of: (1) the relationship of the improper evidence to the central issues in the case, *particularly as highlighted by the parties' summations*; (2) whether the trial court took any measures, such as corrective instructions, that might mitigate the effect of the evidentiary impropriety; and (3) whether the improperly admitted evidence is merely cumulative of other validly admitted testimony. . . . The overriding question [we must answer] is whether the trial court's improper ruling affected the jury's perception of the remaining evidence." (Citations omitted; emphasis added; internal quotation marks omitted.) *Hayes* v. *Camel*, 283 Conn. 475, 489–90, 927 A.2d 880 (2007); see also *Duncan* v. *Mill Management Co. of*

*Greenwich, Inc.*, 308 Conn. 1, 20, 60 A.3d 222 (2013).

Without a complete record, we are unable to fully apply and appropriately assess the *Hayes* factors. For example, even if we assume, arguendo, that the document and the photo improperly were admitted into evidence,[5] we are unable to assess fully and completely the first *Hayes* factor, "the relationship of the improper evidence to the central issues in the case, *particularly as highlighted by the parties' summations*"; (emphasis added) *Hayes* v. *Camel*, supra, 283 Conn. 489; because we do not have a transcript of the parties' summations.[6]

Also, our analysis of the remaining *Hayes* factors is equally unfeasible. Indeed, although we know that we have transcripts for at least some of the witnesses and some of the court's curative instructions, we do not know whether any additional instructions were given or what was contained in the testimony for which the plaintiff has not provided transcripts. We also are unable to fully assess whether the document and the photo were cumulative of other validly admitted evidence because we do not have a complete record of the trial, including the plaintiff's direct testimony. Consequently, we cannot conduct a full and complete analysis of harm pursuant to the *Hayes* factors. Accordingly, we conclude that without a complete record of the trial, we are left with an inability to make an informed assessment of the plaintiff's claims on appeal, and we are unable to consider "[t]he overriding question [of] whether the trial court's [alleged] improper ruling affected the jury's perception of the *remaining evidence*." (Emphasis added; internal quotation marks omitted.) *Hayes* v. *Camel*, supra, 283 Conn. 490.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The original complaint was brought by Pecher, Sophia Pecher-Kohout, and Jaromir Kohout. Pecher-Kohout and Kohout subsequently withdrew their claims, and they are not parties to this appeal. We, therefore, refer to Pecher as the plaintiff.

[2] In the original complaint, the plaintiff named Distefano and Showtime Stables as defendants. Subsequently, all claims against Showtime Stables were withdrawn. Accordingly, we refer to Distefano as the defendant.

[3] We are mindful that the plaintiff represented to the trial court in her motion to set aside the verdict that "[t]he jury heard testimony from *three . . . experts and nine . . . lay witnesses*." (Emphasis added.) If this representation is accurate, and we have no reason to believe that it is not accurate, we have been provided the testimony or the partial testimony of only four of the twelve witnesses who testified at trial.

[4] Because the plaintiff cannot establish, on the basis of the record that she has provided to us, that the court's rulings were harmful, it is unnecessary for us to decide conclusively whether the document and the photo improperly were admitted into evidence. See *Duncan* v. *Mill Management Co. of Greenwich, Inc.*, 308 Conn. 1, 20, 60 A.3d 222 (2013) ("[a]n evidentiary ruling will result in a new trial only if the ruling was both wrong *and* harmful" [emphasis in original; internal quotation marks omitted]). Nevertheless, we take this opportunity to recognize an interesting argument raised by the defendant concerning the relevance of the document and the photo.

General Statutes § 52-557p provides: "Each person engaged in recreational equestrian activities shall assume the risk and legal responsibility for any injury to his person or property arising out of the hazards inherent in equestrian sports, *unless the injury was proximately caused by* the negli-

gence of the person providing the horse or horses to the individual engaged in recreational equestrian activities or *the failure to guard or warn against a dangerous condition, use, structure or activity by the person providing the horse or horses or his agents or employees.*" (Emphasis added.)

In the plaintiff's complaint, she made three allegations concerning the defendant's negligent failure to warn against a dangerous condition: (1) "fail[ure] to warn the plaintiff of the dangerous condition caused by the use of the crop/whip"; (2) "fail[ure] to warn the plaintiff of the dangerous condition caused by the opening in the arena when it was unreasonable not to have done so"; and (3) "fail[ure] to warn the plaintiff of the dangerous condition caused by the jumping gate the that injured the plaintiff when it was unreasonable not to have done so." During oral argument on the plaintiff's motion in limine, the defendant argued that the document was relevant to demonstrate that the plaintiff had been warned of inherent risks. On the basis of the arguments presented to it, the trial court expressed some agreement with that contention. On appeal, the plaintiff argues, for the first time, that the document had no relevance because § 52-557p already provides that the plaintiff assumes all inherent risks. The defendant argues, however, that the plaintiff's specific allegations of a failure to warn necessitated her providing proof that she, in fact, did warn the plaintiff.

Although presenting an interesting question as to whether the "*unless the injury was proximately caused by the . . . failure to guard or warn against a dangerous condition, use, structure or activity*" portion of the statute was implicated by the plaintiff's allegations of the defendant's failure to warn against particular dangerous conditions, and whether the document and the photo could be evidence sufficient to defend against this portion of § 52-557p, because we conclude that the plaintiff has failed to establish harm, we defer our analysis of the statute for another day.

[5] Although we do not decide whether the court's admission of the document and the photo was improper, we do recognize that the use of these types of releases is against public policy; see *Reardon* v. *Windswept Farm, LLC*, supra, 280 Conn. 153; and the admission of evidence that contravenes public policy generally is not favored.

Our courts have recognized that certain evidence is inadmissible because it violates the public policy of this state. See Conn. Code Evid. § 4-9, commentary (explaining that rule barring admission of evidence of payment regarding medical and similar expenses fosters public policy of encouraging assistance to injured party by eliminating threat that evidence can be used as admission of liability at trial), citing *Danahy* v. *Cuneo*, 130 Conn. 213, 216, 33 A.2d 132 (1943). In denying admission of such evidence, our courts have recognized that the public policy promoted by the exclusion of such evidence outweighs the minimal relevance of such evidence. Nevertheless, such evidence may be admissible in particular circumstances if it is offered for a purpose other than that which has been found to violate public policy. See *Duncan* v. *Mill Management Co. of Greenwich, Inc.*, supra, 308 Conn. 14–15 (although evidence of subsequent remedial measures is violative of public policy when used to prove negligence, such evidence may be admissible to prove some other material issue); *Hicks* v. *State*, 287 Conn. 421, 440, 948 A.2d 982 (2008) (same); *Miko* v. *Commission on Human Rights & Opportunities*, 220 Conn. 192, 209, 596 A.2d 396 (1991) (although evidence of offers to compromise is inadmissible as violative of public policy, statements made during such offers may be admissible as admissions of fact).

Here, as we mentioned in footnote 4 of this opinion, the defendant sought to admit the subject evidence on a theory other than to prove that the plaintiff had waived her right to pursue a negligence action, i.e., that she was aware of the risks and the defendant in fact had warned her of those risks. Because of the inadequacy of the record, we need not decide, however, whether the actual purpose for which the evidence was offered provided a sufficient basis upon which to admit this evidence or whether the trial court appropriately balanced the probative value of the evidence against its prejudicial effect.

[6] Moreover, despite the plaintiff's argument that the document and the photo "took center stage in the defendant's trial presentation," the parties acknowledge that no one attempted to use the document and the photo as a waiver of negligence at any time during the trial. Furthermore, although the plaintiff attempts to establish that the document was central to the defendant's case because *four witnesses* were asked about it during the trial, as we noted previously, the plaintiff stated, in her motion to set aside the verdict, that "[t]he jury heard testimony from three . . . experts and nine . . . lay witnesses" in this case. Assuming the truth of that representa-

tion by the plaintiff, we question whether the fact that four of twelve witnesses were questioned about the document signifies its centrality.

The central issue of this case appears to have been whether the defendant was negligent in one or more of the ways alleged, including for a failure to warn of particular dangerous conditions; it was not whether the plaintiff had waived her rights or released the defendant from liability for such alleged negligence. Compare *Reardon* v. *Windswept Farm, LLC*, supra, 280 Conn. 153 (rendering summary judgment in favor of defendants, who had raised as defense fact that horseback riding student had signed release and waived claims for liability arising from personal injuries she had sustained during riding lesson, was reversible error because release from liability was void as against public policy). There is no indication in the record that the plaintiff has provided, and the plaintiff, on appeal, sets forth no argument, that the defendant made any attempt to establish, allege, or in any manner argue that the plaintiff released the defendant from liability for her injuries.

—————————————————————